767 F.2d 1052
 18 Fed. R. Evid. Serv. 1335
 UNITED STATES of America, Appellee,
v.
Newby Franklin LOVE, Appellant.
UNITED STATES of America, Appellee,
v.
Newby Franklin LOVE, Appellant.
UNITED STATES of America, Appellee,
v.
Robert Edward LEE, Appellant.
UNITED STATES of America, Appellee,
v.
Sue Robinson YOUNGBLOOD, Appellant.
UNITED STATES of America, Appellee,
v.
Robert Edward LEE, Appellant.
 Nos. 83-5171(L), 83-5172 to 83-5174 and 84-5262.
 United States Court of Appeals,
Fourth Circuit.
 Argued Nov. 1, 1984.
Decided July 3, 1985.
Rehearing and Rehearing En Banc Denied July 29, 1985.
 
 Jack B. Swerling, Columbia, S.C., J. Edward Bell, III, Sumter, S.C., John L. Pollok, New York City (Edward Gasthalter, New York City, on brief), for appellants.
 Cameron B. Littlejohn, David J. Slattery, Asst. U.S. Attys., Columbia, S.C. (Henry Dargan McMaster, U.S. Atty., Columbia, S.C., Sylvia K. Amaker, Paralegal Specialist on brief), for appellee.
 Before ERVIN and WILKINSON, Circuit Judges, and MICHAEL, United States District Judge for the Western District of Virginia, sitting by designation.
 ERVIN, Circuit Judge:
 
 
 1
 Newby Franklin Love, Sue Robinson Youngblood, and Robert Edward Lee appeal from their convictions after a two-week jury trial on a nineteen-count superseding indictment alleging various drug related offenses. Specifically, the three appellants were convicted of violating the federal racketeering statute, 18 U.S.C. Sec. 1962(c), (d) (1982), (i.e. the "RICO" statute) together with various federal drug laws, 21 U.S.C. Sec. 841(a)(1), 846, 952(a), 960, 963 (1982).[1] In addition, Love and Youngblood were also convicted of violating the Travel Act, 18 U.S.C. Sec. 1952(a)(3) (1982), and of transporting stolen aircraft in interstate commerce in violation of 18 U.S.C. Sec. 2312 (1982).[2] Love was also convicted of wilfully and knowingly engaging in a continuing criminal enterprise ("CCE") in violation of 21 U.S.C. Sec. 848.[3] The three appellants were also acquitted on some of the counts charged against them.[4] Each appellant received substantial sentences.[5]
 
 
 2
 Appellants now assert a number of different grounds for reversal on appeal. After careful consideration of each allegation of trial error, we are convinced that reversal is not required. Consequently, we refuse to disturb the appellants' convictions and affirm the judgments of the district court.
 
 I.
 FACTUAL BACKGROUND
 
 3
 At the outset, it should be noted that the arrests of the appellants culminated an extensive investigation carried on over several months by federal and state agents in South Carolina, Georgia, and Florida. The facts of this case are very complex as they involve many separate incidents which together comprise the basis for the appellants' arrests and convictions. As a consequence, only the facts pertinent to this appeal will be summarized. For our purposes, the appellants' illegal activities may be separated into three broad categories: (1) the drug-related activities of 1980-1981, (2) the armed robberies and cocaine trafficking in 1982, and (3) the drug smuggling operations in 1982.
 
 A. Drug-related activities of 1980-1981
 
 4
 Love and Youngblood's 1980-1981 drug-related activities constitute the earliest overt acts upon which their Count 1 RICO conspiracy convictions are based. These activities revolve around their relationship with two drug dealers, Elmer Charles Dalton and James Milton King. Dalton and King were involved in a number of profitable interstate cocaine and marijuana sales with Love between September 1980 and January 1981. Love sold Dalton and King large quantities of marijuana and cocaine for later resale and distribution on several different occasions during this period. Dalton and King had been introduced to Love by Youngblood who also was involved in at least one of these interstate drug transactions. Lee, however, was not implicated in any of these early drug activities.
 
 
 5
 B. Armed robberies and cocaine trafficking in 1982
 
 
 6
 Beginning some time prior to 1982, Youngblood and Love became engaged in a drug trafficking partnership in which Youngblood supplied Love with cocaine, which she transported to South Carolina from Florida. Love then sold this cocaine to dealers throughout the region. This partnership eventually blossomed into the drug smuggling operations of June-December, 1982. In addition, Wilbur Rutledge "Rusty" Corvette and Ralph Bruce Bannister were hired by Love in 1982 to commit several robberies of competing drug dealers and other individuals who Love felt would be unlikely to report such crimes to the authorities. Corvette and Bannister usually sought Love's prior sanction of these robberies to insure that the victim was not a distributor of drugs supplied by Love. In most instances, Love furnished the weapons and vehicles used in the robberies and afterwards received jewelry or other proceeds of the crime. Youngblood was aware of these robberies and also received proceeds in at least one instance.[6] However, Lee was not involved in any of these robberies.
 
 C. Drug Smuggling Activities of 1982
 
 7
 During the latter half of 1982, Youngblood and Love arranged several unsuccessful attempts to import marijuana and cocaine directly to South Carolina from Colombia. Their first smuggling venture was attempted in June of that year. At that time, Love told Corvette that he was planning to bring 1200 to 1500 pounds of marijuana to South Carolina from South America by plane. Together Love and Corvette went to Florida to meet Youngblood and discuss this operation. Soon after this meeting, they attempted the smuggling run and dispatched a plane to South America.
 
 
 8
 On June 15, 1982, Love, Corvette and Wayne Rodgers prepared to meet the marijuana-laden plane at a drag strip near Columbia on its return from South America. However, because of communications mishaps and lack of fuel, the plane did not land at the drag strip. Instead, the plane was abandoned at a small airport in Columbia, South Carolina. It was found the next day by law enforcement officials. Examination of the plane revealed that its long-range fuel tanks contained only 8-10 gallons of fuel. In addition, its seats had been removed, and there were 18 bales of marijuana weighing 541 pounds on board. The landing flaps had not been closed and the door to the cockpit had been left ajar. Fingerprints taken from the fuselage and from food wrappers and navigational charts found in the cockpit subsequently were identified as those of Timothy Roy Rivera. Millard Waites, a convicted drug smuggler, testified at trial that prior to the flight he had given Rivera's name and telephone number to Love after Love asked him for the name of a pilot. Love subsequently hired Rivera for the smuggling job.
 
 
 9
 Several weeks after this failed attempt, Love told Corvette that he had obtained another plane for a smuggling trip to South America. Once again Rivera was to be the pilot for the Love-Youngblood smuggling operation. Once again, however, this run was aborted when the plane crashed on the way to South America.
 
 
 10
 Afterwards, in August, 1982, Love, Waites, Kenneth Davidson, Youngblood, Rivera, Rivera's brother, and Corvette met at Love's apartment to plan their next smuggling venture. As a first step, Youngblood, Rivera, and Rivera's brother stole a Cessna 404 Titan airplane from Trager Aviation Company in Lima, Ohio. After redesigning the plane to transport drugs, Rivera again piloted the plane to South America. John Furmen Walker, alias "Double R", accompanied him on this trip. Success eluded them another time, however, when they ran low on fuel during the return trip, and were forced to land in Sarasota, Florida. Although the police discovered the plane before they could unload the marijuana, Rivera and Walker were able to escape. The police discovered 46 bales of marijuana weighing 1594 pounds on board the plane when they arrived.
 
 
 11
 A fourth attempted smuggling run was scheduled for November, 1982. For this next venture, Love sought a pilot who could fly a large cargo plane. Love requested that Joe Merolla, the owner of the airplane leasing company Southern Aero Traders, ask Frank Kelly, an Opa Locka, Florida airport employee, to evaluate Rivera and another Colombian pilot from Southern Aero Traders to see if they could fly a large cargo plane. Unknown to Love, Merolla and Kelly were DEA informants. Kelly evaluated the two pilots and concluded that they could not fly large cargo planes. Youngblood then offered Kelly $50,000 to fly the plane to South America himself. Kelly accepted and was paid $5000 by "Double R". Kelly later met with "Double R", Youngblood and Love to discuss the details of the smuggling run. He learned that the first plane load would contain 4500 pounds of marijuana. That was to be followed by a load of cocaine two days later. At this meeting, Love told Kelly that the two Colombians had lost three of his planes while one of his Howard 250 aircraft had already made six successful trips to South America.
 
 
 12
 Following this meeting, appellant Lee came to Opa Locka to be Kelly's co-pilot. The trip was postponed several times as Kelly repeatedly tried to avoid making the trip. Finally Kelly, Lee, "Vargas" (a Colombian dealer) and "Double R" took off for South America. Kelly deliberately closed the flaps on the plane which caused the engine to overheat and forced them to land at New Smyrna Beach, Florida. After making repairs, Double R and Vargas then continued on to South America.
 
 
 13
 Meanwhile, Love and Corvette readied themselves for the arrival of the plane back in Sumter County with a group of ten men bearing machine guns and hand grenades. Love told Corvette that the extra men were there to fight the police if the need arose. A couple of days later, Love and Corvette learned that the plane had blown up after taking off with the marijuana on board in Colombia. Despite this fourth setback, Love and Youngblood did not waste time in planning what was to be their fifth and final unsuccessful smuggling venture together.
 
 
 14
 In early December, 1982, Joe Merolla informed the DEA that Leo Rosquette and others were planning to smuggle 700 to 800 pounds of cocaine from Colombia to Love in South Carolina around December 20, 1982. Merolla kept the DEA apprised of this venture daily since his company was installing long range fuel tanks in a plane the smugglers had just bought from him in Opa Locka for the smuggling trip. In addition, Merolla installed an electronic beeper on the modified plane to monitor its flight path once it was airborne.
 
 
 15
 On December 19, 1982, Lee flew the plane from Opa Locka to New Smyrna Beach where he met Youngblood. He then flew on to South America. After the plane left New Smyrna Beach, federal and state officers set up surveillance teams at the Lee farm in Sumter County (the suspected primary landing site), the Sumter County airport, and the Walterboro airport. At 9:10 p.m. that evening, the Walterboro team heard the plane's beeper signal and radioed that the plane was heading for Sumter.
 
 
 16
 At some time after 9:00 p.m., the pilot of the plane called the Sumter airport for clearance to land. At trial, two men who knew Lee well identified the taped voice of the pilot as that of Lee. The plane then landed at the Sumter County Airport at 9:47 p.m. After the arrival of the Customs helicopter at 10:30 p.m., the airport surveillance team secured the area. The airport was sealed and a search ensued. At 10:45 p.m, defendant Gonzales-Fuentes was found hiding under a ledge in the shrubbery next to the terminal building and was arrested. He was carrying $4000 in cash, a passport and a round-trip ticket from Medellin, South America to Miami, Florida, on which the return trip had not been used. He also reeked of chemicals.
 
 
 17
 A search of the plane at the airport uncovered 20 duffel bags containing 955.1 pounds of cocaine with an estimated street value of $350 million. On top of the duffel bags was a clothes bag containing two letters addressed to Lee from his attorney, a monogrammed shirt with the initials "REL", a thermos bottle later determined to have Lee's fingerprints on it, aeronautical charts in Lee's handwriting and flight plans from Monteria, South America and Riohacha, South America to South Carolina.
 
 
 18
 Meanwhile, police officers at the Lee farm stopped a motor home and arrested its occupants, defendants Ruiz and Restrepo. At the same time, officers stopped a pickup truck with a camper in tow on an access road at the end of the Sumter County runway. The driver was Lee. He appeared exhausted and reeked of chemicals.
 
 
 19
 Later that night, at approximately 2:15 a.m., Love and Youngblood drove to the Lee farm which by now was secured by agents, and parked in the carport. Agents immediately converged on the car to prevent the appellants from leaving. Upon learning that the occupants of the car were Youngblood and Love, the agents patted Love down and made a cursory search of both the car area where he was sitting and of Youngblood's purse. Agent Hill advised Love that he and Youngblood could leave if they helped the officers determine that they were at the farm innocently and were not involved in the drug smuggling operation. However, the two appellants did not offer any explanation for their presence. Agent Pittard, aware that Love might be involved in the smuggling operation, advised his superior officers that Love had arrived at the farm. He was subsequently directed to detain Love and Youngblood until the agents in charge of the investigation arrived. Pittard did so and informed Love that agents would soon arrive to charge him with narcotics violations. Soon thereafter, Youngblood and Love asked for permission to use the restroom. Although Pittard told them they could enter the house, the appellants said they preferred to relieve themselves outdoors. Love went to a nearby tree while Youngblood went to some bushes several yards away. Some twenty minutes later, Agents Stewart and Shumard arrived and placed the appellants under arrest. After his arrival, Agent Hill went to the bushes where Youngblood had gone and discovered several packages containing cocaine. In addition, he found several torn-up pieces of paper. Agent Pittard also found torn-up papers near the tree where Love had gone to relieve himself.
 
 
 20
 These papers included the telephone numbers for "Double R" and Lee. An examination of Youngblood's address book also revealed the telephone numbers and addresses for Rusty Corvette, Rivera, Tom and Joe Merolla (Southern Aero Traders), "Double R", Kenneth Davidson, Frank Kelly, "Leo", and Robert Lee. In addition, when Lee was arrested, he had Youngblood's Richmond Hill telephone number on a slip of paper. It was later determined that a collect call had been made from the pay phone at the Sumter airport to Youngblood's home in Richmond Hill, Georgia, at 10:25 p.m. on December 20, 1982.
 
 
 21
 The Lee farm was searched pursuant to a search warrant on December 23, 1982. Found in the house were an aircraft radio transceiver, a "blue box" radio, two walkie-talkies, a hand-drawn map of the Carribbean and part of South America, and a book entitled "The Smuggling Business." A large antenna was also found on the house roof. In addition, six airplane seats were found stored in a truck behind the residence and several old tires were found in an outside storage area.
 
 
 22
 Because we believe the various issues presented for our consideration on this appeal have little merit, we will discuss each only briefly.
 
 II.
 Jury Instructions
 
 23
 Love, Youngblood and Lee attack the trial court's jury instructions on a number of grounds. We will address each in turn.
 
 A. The doctrine of mere presence
 
 24
 The appellants first contend that the trial court's charge regarding the doctrine of mere presence unfairly focused on defendants Ruiz and Restrepo to the appellants' detriment.[7] We disagree. The district court was very careful to explain to the jury that a criminal defendant's mere presence at the scene of the crime or his knowledge of that crime is insufficient to establish that he joined a conspiracy or aided and abetted in the commission of the crime. Instead, the defendant's active, knowing participation is required before a conviction may be entered. See United States v. Weil, 561 F.2d 1109, 1112 (4th Cir.1977).
 
 
 25
 At no time did the district court below suggest to the jury that the appellants could not be found to have been merely present at the scene of the crime and hence not guilty.[8] Although it might have been preferable for the trial court to have kept his instructions more broadly constructed, this aspect of the jury charge did not in any way prejudice the appellants by misleading or confusing the jury. See United States v. Moss, 756 F.2d 329, 333-334 (4th Cir.1985).
 
 B. Intent
 
 26
 Appellants next contend that the trial court's instructions created a mandatory presumption with respect to the element of intent and thereby reduced the government's burden of proof below the constitutionally required "beyond all reasonable doubt" standard.[9] See In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). The Supreme Court has consistently condemned the use of conclusive presumptions regarding disputed elements of a particular crime because "[t]o allow a reviewing court to perform the jury's function of evaluating the evidence ... when the jury never may have performed that function, would give too much weight to society's interest in punishing the guilty and too little weight to the method by which decisions of guilt are to be made." Connecticut v. Johnson, 460 U.S. 73, 103 S.Ct. 969, 74 L.Ed.2d 823 (1983); see also Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979); Tweety v. Mitchell, 682 F.2d 461 (4th Cir.1982), cert. denied, 460 U.S. 1013, 103 S.Ct. 1255, 75 L.Ed.2d 483 (1983). Nevertheless, the instruction in this case did not "create a conclusive or burden shifting presumption on intent" in the manner of the instructions condemned in Sandstrom and Johnson. Instead, the charge merely instructed the jury as to what a reasonable inference would be. The individual jurors were not required to draw any inference. Given the district court's explanation of both the element of intent and its instruction reflecting the government's need to prove all the elements of the alleged crimes, including intent, beyond all reasonable doubt, we believe the charge, taken as a whole, did not create a conclusive presumption regarding intent nor constitute reversible error. See United States v. Arthur, 544 F.2d 730 (4th Cir.1976) ("An instruction that it is reasonable to infer that a person ordinarily intends the natural and probable consequences of his voluntary acts has generally been held proper.").
 
 C. Credibility of Witnesses
 
 27
 The appellants next challenge that portion of the district court's charge relating to the credibility of witnesses. Specifically, they object to the trial court's instruction that:
 
 
 28
 "If you find the presumption of truthfulness to be outweighed as to any witness, you will give the testimony of that witness such credibility, if any, as you may think it deserves."
 
 
 29
 This court has long held that the instruction that a witness is presumed or assumed to tell the truth is improper. See United States v. Safley, 408 F.2d 603 (4th Cir.), cert. denied, 395 U.S. 983, 89 S.Ct. 2147, 23 L.Ed.2d 772 (1969). We reiterated this point most recently in United States v. Varner, 748 F.2d 925 (4th Cir.1984) in holding such an instruction to be erroneous and remanding that case for a new trial. In Varner, the defendant objected to the instruction at the trial below. In this case, however, no objection to this part of the charge was made. This failure to object precludes our review of the challenged instruction unless it constitutes "plain error". In United States v. Safley, supra, we considered whether a "presumption of truthfulness" instruction such as the one tendered here constituted plain error. We held that it did not. Safley governs our disposition of this issue on appeal today. The trial court did not commit plain error by issuing this instruction.
 
 D. Other challenged instructions
 
 30
 Appellants also contend that the district court's charge relating to the definition of reasonable doubt constituted plain error necessitating a reversal of their convictions.[10] We begin by noting that "attempts to explain the term 'reasonable doubt' do not usually result in making it any clearer to the minds of the jury". Smith v. Bordenkircher, 718 F.2d 1273, 1276 (4th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 2355, 80 L.Ed.2d 828 (1984) (quoting Holland v. United States, 348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954) ). As a result, this court has repeatedly joined "in the general condemnation of trial court attempts to define reasonable doubt in their jury instructions." United States v. Moss, 756 F.2d at 333. See also, e.g., Smith v. Bordenkircher, 718 F.2d at 1276; Whiteside v. Parke, 705 F.2d 869, 871 (6th Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 141, 78 L.Ed.2d 133 (1983); United States v. Martin-Trigona, 684 F.2d 485, 493 (7th Cir.1982); Dunn v. Perrin, 570 F.2d 21, 23 (1st Cir.), cert. denied, 437 U.S. 910, 98 S.Ct. 3102, 57 L.Ed.2d 1141 (1978). Nevertheless, we have recognized that "[m]ere attempts to define reasonable doubt do not ... constitute reversible error per se." Moss, supra, at 333. While we cannot endorse the district court's attempt to define reasonable doubt, we are satisfied that the instructions in this case were not plain error and do not require reversal of the appellants' convictions. In no way were the instructions "misleading or confusing" and, viewed in the context of the charge as a whole, "correctly convey[ed] the concept of reasonable doubt." Id. Consequently, the challenged instructions regarding reasonable doubt are not sufficiently prejudical to warrant reversal.
 
 
 31
 In addition, appellants challenge the trial court's instruction that "If a Defendant be proven guilty, say so; if not proved guilty, say so." We conclude that this instruction does not constitute plain error in light of the district court's ameliorating instruction squarely placing the burden on the government to prove the defendant guilty of the crimes charged beyond all reasonable doubt. Finally, we are convinced that the district court's instructions regarding "attempt" and "aiding and abetting" are both accurate and clear and do not constitute plain error requiring a reversal of the appellant's convictions.
 
 III.
 The Continuing Criminal Enterprise
 
 32
 Love attacks his conviction and resulting sentence under 21 U.S.C. Sec. 848 on several grounds, none of which are meritorious. In particular, Love argues that the district court's jury instruction regarding the continuing criminal enterprise count was improper. The challenged portion reads as follows:
 
 
 33
 Thus you must find beyond a reasonable doubt that Defendant Love is guilty as charged in any of Counts 2, 3, 5, 6, 7, 8, 10, 11, 13, 14, 17 and 18, and that the conduct charged in any of these counts, together with additional violations of the drug laws, constituted a total of three or more violations of the federal drug laws committed over a period of time with a single or similar purpose. This will constitute a finding that the Defendant Love engaged in a continuing series of violations (A. 142). (emphasis added)
 
 
 34
 Love argues that the use of the term "drug laws" enabled the jury to consider as predicate offenses under Section 848 crimes not included in that section, i.e., non-subchapter I or II offenses.[11] However, we believe that in the context of this charge the language "additional violations of the federal drug laws" referred to felony drug offenses not specifically charged as substantive counts but on which evidence had been presented. These offenses, plus the counts listed in the charge, all contemplated crimes under subchapter I or II and were the only offenses which could be considered in establishing the three violations necessary to support a continuing criminal enterprise conviction. Consequently, the district court committed no error in giving this instruction.[12]
 
 
 35
 In addition, Love argues that he was improperly convicted and sentenced under both RICO and Section 848. We disagree. These statutes contemplate separate and distinct offenses which may be punished separately. See United States v. Phillips, 664 F.2d 971, 1010-14 (5th Cir.1981), cert. denied sub nom. Meinster v. United States, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354, sub nom. Platshorn v. United States, 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982).[13]IV.
 
 Multiplicitous Counts
 
 36
 The appellants argue that several counts in their indictment were improperly multiplicitous. We disagree. The Supreme Court has determined that conspiracies and the substantive offenses committed in the course of those conspiracies are separate offenses and may be charged separately. Callanan v. U.S., 364 U.S. 587, 81 S.Ct. 321, 5 L.Ed.2d 312 (1960); Iannelli v. U.S., 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975). In this indictment, count 2 charged the appellants with conspiring to import and attempting to import controlled substances. Counts 7, 10, and 13 charged the appellants with attempting to import specific planeloads of controlled substances. The latter three counts are substantive offenses separate from the conspiracy count and may be charged independently under Callanan. Similarly, count 3 charged the appellants with conspiracy to possess and attempt to possess narcotics with the intent to distribute. Counts 8, 11, and 14 charged the appellants with attempting to possess narcotics with the intent to distribute. Under Callanan, counts 8, 11, and 14 are specific substantive offenses charged separately from the overall conspiracy. These counts at issue are therefore not multiplicitous.
 
 V.
 Double Jeopardy
 
 37
 Youngblood and Lee were convicted on count 1 of conspiracy to violate the RICO statute, on count 2 of conspiracy to import drugs and on count 3 of conspiracy to possess drugs with the intent to distribute. They contend that all three conspiracies were "identical in goals, participants, time span and substantive crimes committed." Therefore, they assert that conviction and sentencing for all three constitute multiple punishments for the same crime in violation of the double jeopardy clause of the Constitution. See North Carolina v. Pearce, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969). We disagree.
 
 
 38
 Each conspiracy conviction involves an element of proof not required by the others. See United States v. Blockburger, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). A conviction for conspiracy to import does not require proof of conspiracy to possess and distribute. Neither proof of importation nor possession is required for a RICO conviction. In addition, these RICO convictions included armed robberies and Travel Act violations as predicate offenses. Neither set of these offenses were elements of proof for the narcotics violations.
 
 
 39
 Separate offenses involving the same or similar acts which violate different statutes may be charged and sentenced separately and consecutively. See United States v. Albernaz, 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981). Where a RICO conspiracy overlaps with other conspiracies, separate convictions and sentences may be imposed for both conspiracies. See United States v. Phillips, 664 F.2d at 1010-1014. Consequently, we find no error in the conviction and sentencing of the appellants on counts 1, 2, and 3.
 
 VI.
 Constitutionality of Warrantless Arrest
 
 40
 Love and Youngblood argue that their arrest was constitutionally defective because they were arrested without a warrant. This argument is without merit. Based on the "totality of the circumstances," the government agents had valid probable cause to be stationed on Lee's premises. See Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). In addition, the exigencies of the circumstances surrounding the appellants' apprehension necessitated a warrantless arrest. Cf. Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (absent exigent circumstances, an arrest in the home or curtilage area around the home must be accomplished by means of an arrest warrant.) Here, agents were properly stationed to apprehend those suspects who might surface at the primary landing site.
 
 VII.
 Other Alleged Trial Errors
 A. Testimony of Agent Hill
 
 41
 The appellants contend that a mistrial should have been ordered after Agent Hill testified that Love and Youngblood made no effort to explain their presence at the Lee farm on the night of their arrest. We agree with the district court that a mistrial was not warranted. The Supreme Court held in Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) that testimony concerning a defendant's silence "at the time of arrest and after receiving Miranda warnings" is inadmissible. However, the Court has subsequently refined its rule in Doyle to permit testimony concerning a defendant's silence where the defendant has not "received any Miranda warnings during the period in which he remained silent immediately after his arrest." Fletcher v. Weir, 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982); see also Folston v. Allsbrook, 691 F.2d 184, 187 (4th Cir.1982), cert. denied, 461 U.S. 939, 103 S.Ct. 2111, 77 L.Ed.2d 314 (1983). In this case neither Love nor Youngblood had been given any Miranda warnings at the time Agent Hill observed their silence. As a result, under Doyle and Fletcher, Agent Hill's testimony was properly admitted.
 
 B. The Testimony of Agent Shumard
 
 42
 The appellants argue that DEA Agent Shumard's testimony concerning information he received from a fellow DEA agent in Florida about proposed landing sites in South Carolina is inadmissible hearsay. We find this argument unpersuasive.
 
 
 43
 Fed.R.Evid. 801(c) defines an out of court statement as hearsay if it is "offered in evidence to prove the truth of the matter asserted." However, an out of court statement is not hearsay if it is offered for the limited purpose of explaining why a government investigation was undertaken. United States v. Scott, 678 F.2d 606, 612 (5th Cir.), cert. denied, 459 U.S. 972, 103 S.Ct. 304, 74 L.Ed.2d 285 (1982); see also United States v. Hunt, 749 F.2d 1078, 1084 (4th Cir.1984), cert. denied, 53 U.S.L.W. 3880 (U.S. June 18, 1985) (No. 84-1481). In this case, Shumard's testimony was offered not for its truth but only to explain why the officers and agents made the preparations that they did in anticipation of the appellants' arrest. As such, it was not inadmissible hearsay. See United States v. Mancillas, 580 F.2d 1301 (7th Cir.), cert. denied, 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978) ("Whether or not the ... statement was true, the fact that it was made would surely explain the flurry of investigative activity in three states the jury was soon to hear about. For this purpose, outlining the background of the investigation with the evidence not being offered to prove its truth, it could be said not to be nonadmissible as hearsay." (citations omitted) ).
 
 C. The Telex
 
 44
 On December 17, 1982, the DEA office in Miami sent a telex to the DEA office in Columbia, South Carolina relating information it had received concerning this investigation. The sources of the information are not indicated in the telex. In brief, the telex stated that Leo Rosquette, a DEA fugitive, was planning to smuggle 900 pounds of cocaine by aircraft to an airfield controlled by Love near Columbia, South Carolina. The plane to be used was N3234D, then located at Southern Aero Traders in Opa Locka, Florida. The telex indicated that the plane was having long-range fuel tanks installed and would be ready to fly to South America on December 19, 1982. The telex also stated that Garrett Clark, another DEA fugitive was tentatively scheduled to be the pilot.
 
 
 45
 Lee contends that the district court's refusal to both admit the telex in evidence and allow full cross-examination concerning its contents was reversible error. We disagree. Regardless of the propriety of the trial court's decision, the error, if any, can only be considered harmless given the overwhelming evidence in the record implicating Lee and contradicting the "tentative" identification of Clark as the pilot in the telex.[14]
 
 D. The Voice Spectrogram
 
 46
 As part of his defense at trial, Lee introduced the testimony of a voice identification expert, Dr. Henry Truby. Dr. Truby testified concerning spectrographic voice analyses he made comparing the tape recording of the pilot's voice with Lee's voice. Lee now argues on appeal that the trial court impermissibly commented to the jury on the credibility of this witness.
 
 
 47
 A federal district court has long had the authority to comment on the evidence introduced at trial. See Quercia v. United States, 289 U.S. 466, 53 S.Ct. 698, 77 L.Ed. 1321 (1933). Such comments are permitted "to assist the jury in arriving at a just conclusion." Anderson v. Warden, Maryland Penitentiary, 696 F.2d 296, 299 (4th Cir.1982), cert. denied, 462 U.S. 1111, 103 S.Ct. 2463, 77 L.Ed.2d 1340 (1983). As a result, we have held that "the judge's comments must be neutral and [are] not [to] be given so as to intimidate the witnesses or otherwise interfere with the ascertainment of truth." Id. at 299. A thorough review of this record has not uncovered any statements by the trial court which undermine his neutrality.[15] His charge to the jury concerning the voice spectrogram was fair if not totally neutral.[16] Therefore, the district court's comments regarding the voice spectrogram did not constitute reversible error.
 
 E. Remaining Issues
 
 48
 Without discussing each allegation of error, we conclude after having carefully reviewed the record and the briefs that none of the appellants' remaining asserted trial errors are sufficiently meritorious to warrant reversal.
 
 VIII.
 CONCLUSION
 
 49
 Considering the complexity of this prosecution, a prosecution involving a two-week jury trial, testimony from 80 government witnesses and the introduction of 150 exhibits, we find particularly appropriate Judge Johnson's concluding remarks in Phillips, and adopt them as equally applicable to the facts of this case:
 
 
 50
 As all experienced trial and appellate judges know, it is virtually impossible to conduct a trial free of some technical errors. This is particularly true in lengthy trials involving multiple defendants and attorneys, and numerous complex substantive and procedural problems. However, a defendant is entitled only to a fair trial, not a perfect one. We are convinced after careful and exhaustive review of the record that each of the defendants received a fair trial. (citations omitted)
 
 
 51
 664 F.2d at 1044.
 
 
 52
 For the foregoing reasons, the appellants' convictions are
 
 
 53
 AFFIRMED.
 
 
 
 [1]
 The three appellants were convicted of engaging in an enterprise conducting a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. Sec. 1961 (Count 1); conspiracy to import and conspiracy to possess marijuana and cocaine with intent to distribute in violation of 21 U.S.C. Secs. 963, 846 (Counts 2 and 3); two counts of attempted importation of marijuana and cocaine in violation of 21 U.S.C. Secs. 952(a), 960, 963 and 18 U.S.C. Sec. 2 (Counts 13 and 17); and two counts of attempted possession of marijuana and cocaine with intent to distribute in violation of 21 U.S.C. Secs. 841(a)(1), 846 and 18 U.S.C. Sec. 2 (Counts 14 and 18)
 
 
 [2]
 Love and Youngblood were convicted of two counts of importation of marijuana in violation of 21 U.S.C. Secs. 952(a) and 960 and 18 U.S.C. Sec. 2 (Counts 5 and 7); two counts of possession of marijuana with intent to distribute in violation of 21 U.S.C. Secs. 841(a)(1), 846 and 18 U.S.C. Sec. 2 (Counts 6 and 8); an additional count of attempted importation of marijuana in violation of 21 U.S.C. Secs. 952(a), 960, 963 and 18 U.S.C. Sec. 2 (Count 10); an additional count of attempted possession of marijuana with intent to distribute in violation of 21 U.S.C. Secs. 841(a)(1), 846 and 18 U.S.C. Sec. 2 (Count 11); and transportation of a stolen aircraft in interstate commerce in violation of 18 U.S.C. Secs. 2312, 2 (Count 12). In addition, Love was convicted of two separate counts (Counts 4 and 9) and Youngblood of one single count (Count 16) of traveling or causing others to travel in interstate commerce with the intent to facilitate the importation and possession of controlled substances with intent to distribute in violation of 18 U.S.C. Sec. 1952(a)(3)
 
 
 [3]
 Count 19
 
 
 [4]
 Love was acquitted of Count 15 (obstruction of justice); Lee was found not guilty of Counts 10 and 11 (attempting to import and attempting to possess 1600 pounds of marijuana with intent to distribute); a directed verdict was entered as to Youngblood on Count 19 (Continuing Criminal Enterprise); and co-defendants Ruiz and Restrepo were acquitted on all charges
 
 
 [5]
 Love was sentenced to 50 years imprisonment on Count 19 (CCE), 20 years imprisonment on Count 1 (RICO) to run consecutively to the term in Count 19, and 5 years imprisonment on Count 12 (transporting stolen aircraft in interstate commerce) to run concurrently with the other sentences imposed, for a total sentence of 70 years imprisonment. Love was not sentenced on any of the drug conspiracy or substantive counts because of the sentence imposed on the continuing criminal enterprise charge
 Youngblood was sentenced to 20 years imprisonment on Count 1 (RICO), 15 years imprisonment on Count 2 to run consecutively to the sentence in Count 1, 15 years imprisonment on Count 3 to run concurrently with the sentence imposed in Count 1, and 5 years imprisonment on each of Counts 5, 6, 7, 8, 10, 11, 12, 13, 14, 16, 17 and 18, to run concurrently with the other sentences imposed, for a total sentence of 35 years imprisonment. Youngblood also received a special parole term of 3 years.
 Lee was sentenced to 20 years imprisonment on Count 1 (RICO), 15 years imprisonment on each of Counts 2 and 3 to run concurrently with the sentence in Count 1, and 5 years imprisonment and a special parole term of 25 years on each of Counts 13, 14, 17 and 18, to run concurrently with each other but consecutively to the sentence imposed in Count 1, for a total sentence of 25 years plus a special parole term of 25 years.
 
 
 [6]
 Youngblood received diamond earrings stolen in the robbery of Paul Shuping on July 31, 1982
 
 
 [7]
 The trial court gave the following instruction regarding "mere presence":
 I would instruct you that mere presence at or near the scene of a crime, or where a crime was supposed to be committed, is insufficient to establish that a defendant joined a conspiracy or aided and abetted in the commission of the crime. If you should find that Ruiz and Restrepo were not willfully part of the conspiracy, or that they were--and that they were merely present near where the crime was committed then it would be your duty to find them not guilty.
 
 
 [8]
 In addition to the "mere presence" instruction in footnote 7, the trial court also instructed that:
 Mere association between a principal and the accused of aiding and abetting is not sufficient to establish guilt, nor is mere presence at or near the scene, or even knowledge that the crime was being committed, sufficient, standing by itself, to establish aiding and abetting. Neither can a person be found guilty of aiding and abetting a crime that has already been fully committed. However, a defendant who willfully joined in the commission of an offense before its full completion may be found guilty as an aider and abettor.
 Additionally, the trial court fully instructed the jury that each element of each crime must be proven beyond all reasonable doubt and that each defendant must have been an active, willful participant in the wrongdoing in order for guilt to be established.
 
 
 [9]
 The appellants challenge the trial court's instruction that:
 "Now you must consider its [sic] reasonable to draw the inference and find that a person ordinarily intends the natural and probable consequences of acts knowingly done or knowingly omitted. You may draw the inference that a Defendant intended all of the consequences which one standing in like circumstances and possessing like knowledge should reasonably have expected to result from any intentional act or conscious omission."
 
 
 [10]
 In particular, the appellants object to that part of the trial court's charge instructing that reasonable doubt
 exists in any case when after a careful and impartial consideration of all the evidence, you the jury does [sic] not feel convinced to a reasonable moral certainty that a Defendant is guilty of the charges.
 In addition, the appellants challenge the instruction that:
 Proof beyond a reasonable doubt is established if the evidence is such as you would be willing to rely and act upon in the more important affairs of your own life.
 
 
 [11]
 21 U.S.C. Sec. 848(b) reads as follows:
 (b) For purposes of subsection (a) of this section, a person is engaged in a continuing criminal enterprise if--
 (1) he violates any provision of this subchapter or subchapter II of this chapter the punishment for which is a felony, and
 (2) such violation is a part of a continuing series of violations of this subchapter or subchapter II of this chapter--
 (A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and
 (B) from which such person obtains substantial income or resources.
 
 
 [12]
 Love contends that the offenses alleged in counts 4 and 9, i.e. traveling in interstate commerce and engaging others to travel in interstate commerce with the intent of carrying on and facilitating the possession with intent to distribute of controlled substances, were impermissibly considered by the jury in its deliberation regarding the continuing criminal enterprise charge since they are offenses under Title 18, not subchapter I or II of Title 21. However, since the trial court specifically omitted these counts in his instruction to the jury on count 19, it is unreasonable to conclude that the term "drug laws" could then be understood to re-include those counts
 
 
 [13]
 We agree with the Fifth Circuit's reasoning in Phillips, 664 F.2d at 1013-14:
 We conclude that the RICO counts are not lesser included offenses of the Sec. 848 count. Both the substantive RICO and RICO conspiracy counts require proof of facts and elements not required to be proved under Sec. 848, even though there is a substantial overlap in the proof offered to establish the crimes. In a substantive or conspiracy RICO prosecution the Government must prove the existence of an enterprise that affects interstate commerce. The existence of an enterprise is an element that is separate from the element of the pattern of racketeering activity in which the enterprise engages; the enterprise is proved by evidence of a continuing organization and by evidence that the members function as a continuing unit. United States v. Turkette, supra [452 U.S. 576], 101 S.Ct. [2524] at 2528 [69 L.Ed.2d 246]. Mere proof of a pattern of racketeering activity, i.e., commission of at least two acts of racketeering activity, is not sufficient to establish a RICO violation; there must also be proof of the existence of the enterprise itself. Section 848, by contrast, does not require proof of a RICO type enterprise. Rather Sec. 848 merely requires proof that the defendant undertook a continuing series of violations in concert or in conspiracy with five or more persons.
 Proof of a Sec. 848 conspiracy does not establish proof of every fact and element necessary to show a RICO conspiracy violation. The object of a RICO conspiracy, as this Court stated in United States v. Elliott, [571 F.2d 880, 902 (5th Cir.1978) ], is to violate a substantive RICO provision, not merely to commit each of the predicate crimes constituting a pattern of racketeering activity. The gist of a RICO offense is that the defendant furthered a racketeering enterprise through a pattern of racketeering activity; a RICO count charges not the commission of the predicate crimes but rather the furthering of the enterprise. United States v. Bright, [630 F.2d 804, 813 (5th Cir.1980) ]. The object of a Sec. 848 conspiracy could be merely to commit the particular narcotics violations which taken cumulatively constitute a continuing series of violations.
 
 
 [14]
 The evidence implicating Lee included the following:
 1) Lee was identified as the pilot flying the plane (i.e. N3234D) from Opa Locka on December 19, 1982 North toward New Smyrna Beach; 2) Lee was identified as he sat on the patio at the airport ten minutes after the plane landed at New Smyrna Beach; 3) Lee was identified paying cash for the 40-45 gallons of fuel used to refuel the plane; 4) Lee's voice was identified as that of the pilot of N3234D on the night of December 20, 1982 by two law enforcement officers who had known Lee for 20 and 10 years respectively; 5) Lee was arrested on an access road at Sumter County airport that same night; 6) Lee was unshaven, exhausted and reeked of chemicals associated with cocaine at the time of his arrest; 7) the police found two letters addressed to Lee from his attorney, a monogrammed shirt with the initials "REL", a thermos bottle with Lee's fingerprints, aeronautical charts with Lee's handwriting and flight plans for Monteria, South America and Riohacha, South America to South Carolina inside the airplane with the duffel bags containing 955.1 pounds of cocaine; and 8) Garrett Clark was never mentioned as a participant in the activities of December 19-20, 1982.
 
 
 [15]
 Even if we assume the district court did make tendentious comments at the time the expert was called, he corrected his error with an immediate ameliorating instruction:
 I'm not expressing any opinion as to--of my own. Of course if I did express an opinion, you would not be influenced in any degree by it because it's up to you. But I am going to let him testify as what we consider an expert witness. (Tr. 13-239, 13-240).
 See U.S. v. Billups, 692 F.2d 320, 327 (4th Cir.1982), cert. denied, --- U.S. ----, 104 S.Ct. 84, 78 L.Ed.2d 93 (1983). (No error where "judge's curative instructions served to assist the jury in giving proper weight to his comments.")
 
 
 [16]
 The trial court instructed the jury as follows:
 Now you will recall that a voice spectrogram was admitted into evidence. I charge you that the spectrogram was only a basis for the voice identification expert's opinion and you may disregard his testimony if you should conclude that his opinion was not based on adequate education, training or experience, or that his professed science of voice print identification was not sufficiently reliable, accurate, and dependable.
 Depending upon your view of the evidence, you are not obligated to accept the opinion of the voice identification expert if you do conclude the reasons supporting that opinion are not sound, or if contradictory evidence casts doubt upon it, or if you conclude that the methods used by the expert are not scientifically acceptable.