36 F.3d 1094
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Olumide Oladipo HASSAN, a/k/a Alex R. Shoga, a/k/a Hassan A.
Akintola, a/k/a Hassan Gallexy, a/k/a Gallexy,
Defendant-Appellant.
 No. 93-5839.
 United States Court of Appeals, Fourth Circuit.
 Argued: May 13, 1994.
Decided: Oct. 3, 1994.
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. T. S. Ellis, III, District Judge. (CR-93-186-A)
 ARGUED: Alan Hideto Yamamoto, Alexandria, VA, for appellant. Bernard James Apperson, III, Asst. U.S. Atty., Alexandria, VA, for appellee. ON BRIEF: Helen F. Fahey, U.S. Atty., Alexandria, VA, for appellee.
 E.D.Va.
 AFFIRMED.
 Before ERVIN, Chief Judge, MICHAEL, Circuit Judge, and CHAPMAN, Senior Circuit Judge.
 OPINION
 PER CURIAM:
 
 
 1
 Olumide Oladipo Hassan appeals from a jury verdict in the Eastern District of Virginia convicting him of one count of conspiracy to possess with intent to distribute one kilogram or more of heroin, see 21 U.S.C. Sec. 846, and one count of interstate travel in aid of racketeering, see 18 U.S.C. Sec. 1952. Hassan's main challenges are to the sufficiency of the evidence. He also challenges the admissibility of certain evidence. Finding no error, we affirm.
 
 I.
 
 2
 Hassan's arrest arose out of the Drug Enforcement Administration's infiltration of a drug trafficking operation headquartered in Pakistan and run there by Mohammed Duranee. Duranee and DEA agents posing as drug couriers agreed that the agents would carry six kilograms of heroin to a middleman in the United States identified by Duranee. The middleman was David Rehman, a Pakistani national located in Virginia. On Duranee's instructions, undercover DEA agents negotiated the price and delivery terms of the heroin at four meetings with Rehman in early April 1993. Rehman's brother, Hafeez, attended the first meeting, at which the sale of the six kilos to an unidentified buyer was discussed. In a subsequent meeting Rehman and the agents agreed (at Rehman's insistence) that a one kilogram sample of the heroin would be given to Rehman, who would deliver it for testing to his buyer, by then described by Rehman as a Nigerian living in Maryland. However, Rehman promised to return within a few hours after delivery of the sample kilo with a $15,000 payment. Rehman indicated that if the sample tested acceptably, the transaction could be completed for all six kilos. Rehman told the undercover agents that the Nigerian had conducted transactions that way in the past and that he and the Nigerian planned larger transactions in the future.
 
 
 3
 Upon Rehman's receipt of the first kilo on April 13, 1993, the agents arrested him. He immediately agreed to cooperate and exposed the Nigerian as a man named Alex. "Alex Shoga" was later revealed to be an alias used by the appellant Hassan.[1] The agents had Rehman place a monitored telephone call to Hassan. During the call Rehman and Hassan decided that Hassan, who lived in Maryland, would meet Rehman the next day at the Crystal City Metro stop in Virginia to pick up the one kilo sample of heroin.
 
 
 4
 Hassan met Rehman as arranged at the Crystal City Metro. Rehman was wired, and the following exchange was taped:
 
 
 5
 Rehman: Hello Alex....
 
 
 6
 Hassan: [D]id you bring it?
 
 
 7
 Rehman: Oh, yeah, ok, start walking?
 
 
 8
 Hassan: Yeah.
 
 
 9
 Rehman: I got one kilo.
 
 
 10
 Hassan: (inaudible) a key.
 
 
 11
 Rehman: One kilo, okay. They want five more. They got five more. Got the money?
 
 
 12
 Hassan: (inaudible).
 
 
 13
 JA 645. Hassan then bought Rehman a Metro ticket and they descended the escalator to the subway platform while making arrangements for Rehman to telephone Hassan later that evening:
 
 
 14
 Hassan: Call me tonight.
 
 
 15
 Rehman: Ok I'll do that.
 
 
 16
 Hassan: Tell them, tell them ok I'll bring the money, you meet me back.
 
 
 17
 Rehman: Today?
 
 
 18
 Hassan: Tonight.
 
 
 19
 JA 646-47. At the bottom of the escalator, Rehman put a briefcase containing the heroin down next to Hassan as a subway train approached. At that point, Hassan was arrested.
 
 
 20
 At trial the government introduced tapes of the telephone and Metro conversations between Hassan and Rehman, and the voice on the tapes was identified as Hassan's by one of his co-workers and a DEA agent, Robert Valentine.
 
 
 21
 Valentine testified about the reverse sting involving Rehman that resulted in Hassan's arrest; he testified to statements made by Rehman about the Nigerian's ("Alex's") role in the conspiracy.[2] Valentine also generally described the greater Pakistani drug conspiracy. Other evidence included: Hassan's address book containing Rehman's work and home telephone numbers and telephone numbers of persons in Pakistan, one of whom had been called by Rehman; Hassan's use of aliases and false social security numbers and addresses; and Hassan's possession of extensive records relating to chemicals used for processing heroin. There was also testimony that Hassan had asked others to obtain secretly some of those chemicals for him.
 
 
 22
 Hassan testified in his own defense and denied any involvement in the conspiracy. Despite his taped conversation with Rehman, his possession of Rehman's business card, and his notation of Rehman's telephone number in his address book, Hassan claimed that he had never spoken to or met Rehman before Rehman approached him at the Metro stop. Hassan's prior conviction for possession with intent to distribute heroin was introduced by the government for impeachment purposes. Hassan denied any involvement in the prior offense beyond introducing the buyer and seller.
 
 II.
 
 23
 A jury verdict must be upheld if there is substantial evidence to support it. Glasser v. United States, 315 U.S. 60, 80 (1941). We decide whether, "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (citation omitted) (emphasis in original); United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir.1982). To establish a violation of 21 U.S.C. Sec. 846, the government must prove that there was a conspiracy and that the defendant knowingly and voluntarily became a party to it. United States v. Bell, 954 F.3d 232, 236 (4th Cir.1992), cert. denied, 114 S.Ct. 112 (1993). "[T]he existence of a conspiratorial agreement may be inferred from the facts and circumstances of the case, i.e., circumstances indicating that two or more persons acted in concert to achieve an illegal goal." United States v. Laughman, 618 F.2d 1067, 1074 (4th Cir.) (citation omitted), cert. denied, 447 U.S. 925 (1980).
 
 
 24
 Hassan asserts two reasons why the evidence was insufficient to support his conviction. First, he relies on the principle that one cannot conspire with a government agent. See United States v. Giunta, 925 F.2d 758, 762-65 (4th Cir.1991). He asserts that even assuming arguendo he had some agreement with Rehman, it was not reached until after Rehman's arrest when Rehman was acting as an agent of the government. Therefore, Hassan says, the agreement was not conspiratorial. Second, Hassan contends that even assuming arguendo he was the other person on the tape-recorded telephone conversations with Rehman, the totality of the evidence shows no more than a buyer-seller relationship between Hassan and Rehman. Examining the evidence and the inferences therefrom in the light most favorable to the government, we find no merit in Hassan's arguments.
 
 
 25
 The first taped telephone conversation between Rehman and Hassan reveals that they had an illegal agreement to conduct the heroin transaction before Rehman's arrest and cooperation with the government. (For at least a week before Rehman's arrest, the DEA agents had been talking to Rehman in their assumed roles as couriers.) In the first taped call between Rehman and Hassan, Rehman did not need to identify himself. Rehman began the call by saying, "I'm sorry I'm a little late"; Hassan responded, "that's alright." JA 634. Hassan then said to Rehman, "I told you to get it and give me a call," indicating prior contact and arrangements. JA 635. Later in the call Hassan mentioned that he "know[s] everybody's keen that's why your friend came, your brother came here twice." JA 636. Thus, before the call Hassan had already been visited twice by Rehman's associates to expedite the arrangements for payment and delivery. Finally, at the end of the call, Hassan instructed Rehman that "[t]his time you will have to be on time (inaudible). I will not wait[,]" showing they had met before. JA 643.
 
 
 26
 The direct evidence also establishes Hassan's knowledge of and participation in a greater conspiracy. Before his arrest Rehman told the agents he had an ongoing drug trafficking relationship with the Nigerian (Hassan) to whom he was delivering the six kilos. Moreover, during the telephone conversation with Rehman, Hassan referred to other coconspirators, saying "these people [ i.e., those buying the heroin] cannot wait. They have to get it...." JA 635. In the same conversation, Hassan acknowledged his earlier meeting with Rehman's associates.
 
 
 27
 The circumstantial evidence also helps prove a broader conspiracy. For example, Hassan's address book contained Rehman's home and work telephone numbers; the address book also had a number for a person named Khahid in Pakistan, whom Rehman called, according to telephone records. Hassan had considerable personal contacts in Pakistan, as shown by address book references and business cards, and he received packages from Pakistan. Also, Hassan possessed documents about chemicals used to process heroin, and he asked others to procure clandestinely some of those chemicals for him. Hassan thus was involved in a drug conspiracy with Rehman and others well before Rehman began cooperating with the government.
 
 
 28
 In light of the foregoing, Hassan's contention that his relationship with Rehman was at most that of buyer and seller hardly needs sepa rate mention. All else aside, that contention is wiped out by a single fact--the large amount of heroin (one kilo) Hassan was receiving upon his arrest and the still greater amount (six kilos) he had agreed to buy. "Where large quantities of narcotics are being distributed, each major buyer may be presumed to know that he is part of a wide-ranging venture...." United States v. Watson, 594 F.2d 1330, 1340 (10th Cir.) (citation omitted), cert. denied, 444 U.S. 840 (1979). Cf. Bell, 954 F.2d at 235 (intent to distribute may be inferred from the amount of drugs involved); United States v. Rusher, 966 F.2d 868, 879 (4th Cir.) (holding that possession of a quantity of drugs too large for personal use establishes intent to distribute), cert. denied, 113 S.Ct. 351 (1992). Moreover, the tapes reveal that Hassan knew Rehman was getting the heroin from couriers and that Hassan himself was delivering to others. The evidence thus was more than sufficient for a rational jury to convict Hassan beyond a reasonable doubt of conspiracy to possess and distribute heroin.
 
 III.
 
 29
 To establish a violation of the Travel Act, 18 U.S.C. Sec. 1952, the government must show (1) interstate travel, (2) intent to promote ongoing unlawful activity, i.e., drug trafficking, and (3) performance or attempted performance of an unlawful act. United States v. Gallo, 782 F.2d 1191, 1194 (4th Cir.1986), cert. denied, 490 U.S. 1070 (1989). In part II, supra, we concluded that the evidence was sufficient to show an ongoing unlawful activity, the second element of Sec. 1952. Hassan additionally challenges the sufficiency of proof on the first and third elements. On the first element, he argues that the government manufactured federal jurisdiction by luring him into Virginia to meet Rehman. This contention has no merit. Hassan, who was travelling from Maryland, initially suggested meeting Rehman at the Van Ness Metro stop in the District of Columbia, a site which would have satisfied the interstate travel element. In any event, the Crystal City, Virginia, site was ultimately suggested by Hassan himself. As to the third element, Hassan contends that he committed no overt act subsequent to his interstate travel that furthered the unlawful activity. The overt act requirement can be satisfied by the performance or attempted performance of any of the acts listed in 18 U.S.C.
 
 
 30
 Sec. 1952(a)(1), (2), or (3).[3] Moreover, the overt act itself need not be illegal. United States v. Zolicoffer, 869 F.2d 771, 775 (3d Cir.), cert. denied, 490 U.S. 1113 (1989). After Hassan travelled from Maryland to Virginia, he met Rehman and confirmed that Rehman brought the heroin. Hassan bought subway tickets for himself and Rehman and arranged to meet with Rehman later that night to give him the money for the couriers. Rehman relinquished control of the bag to Hassan just before Hassan's arrest. In sum, Rehman travelled from Maryland to Virginia to carry on unlawful activity.
 
 
 31
 The evidence establishes a violation of the Travel Act beyond a reasonable doubt.
 
 IV.
 
 32
 Hassan additionally challenges the admission of certain hearsay testimony of agent Valentine at trial relating to (1) the DEA's infiltration of the Pakistani drug ring (in which Valentine was not personally involved), and (2) Rehman's naming his Nigerian buyer as "Alex" after Rehman's arrest. On the first item, Hassan's objection to Valentine's testimony about events in Pakistan was properly overruled. See United States v. Love, 767 F.2d 1052, 1063 (4th Cir.1985) (holding admissible second-hand information offered not for its truth, but to provide context for the investigation and arrest of the defendant), cert. denied, 474 U.S. 1081 (1986). On the second item, there was no objection at trial to Valentine's testimony regarding Rehman's identification of his buyer as a Nigerian named Alex. We cannot notice this as plain error because of the weight of the other evidence of Hassan's guilt. Fed.R.Crim.P. 52(b); see United States v. Olano, 113 S.Ct. 1770 (1993). Even if we could, Valentine's testimony about what Rehman said on this score is admissible as a statement of Hassan's coconspirator, i.e., Rehman. See Fed.R.Evid. 801(d)(2)(E).
 
 V.
 
 33
 We affirm Hassan's conviction on both counts.
 
 AFFIRMED
 
 
 [1]
 Hassan testified that he was born in this country, but moved with his parents to Nigeria when he was five and was adopted in Nigeria by the Shoga family for whom his mother worked. His co-workers knew him as Alex Shoga
 
 
 [2]
 Rehman disappeared after Hassan's arrest
 
 
 [3]
 The Travel Act, 18 U.S.C. Sec. 1952, provides:
 (a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce ... with the intent to
 (1) distribute the proceeds of any unlawful activity; or
 (2) commit any crime of violence to further unlawful activity; or
 (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of any unlawful activity, and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), or (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.