UNITED STATES of America, Appellee,

v.

John David MOSS; and Corvette Center, Inc., Appellants.

No. 83–5301.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 31, 1984.

Decided March 7, 1985.

Clifford R. Weckstein, Roanoke, Va. (Lichtenstein, Weckstein & Thomas, Roanoke, Va., on brief), for appellants.

Karen B. Peters, Asst. U.S. Atty., Roanoke, Va. (John P. Alderman, U.S. Atty., Roanoke, Va., on brief), for appellee.

Before ERVIN and WILKINSON, Circuit Judges, and MICHAEL, United States District Judge for the Western District of Virginia, sitting by designation.

ERVIN, Circuit Judge.

The defendants, John David Moss and Corvette Center Inc., were jointly indicted, tried, and convicted by a jury for various offenses involving the interstate purchase and sale of stolen automobiles in violation of 18 U.S.C. §§ 2, 371, 2312 (1982). Moss was given a sentence that included five years of imprisonment, personal restitution, and a fine. Corvette Center also received a fine. Moss and Corvette Center appeal their convictions alleging that the district court committed several errors requiring reversal. We affirm.

Specifically, the defendants raise three issues on appeal that require our examination. First, they argue that the United States ("government") abused the grand jury process through its post-indictment use of the grand jury as a discovery mechanism. Second, they assert that any attempt by the trial court to explain the reasonable doubt standard constitutes reversible error per se, and alternatively, that the jury instruction in this case was misleading enough to require reversal. Finally, they contend that the district court's jury instruction that the mere number of witnesses testifying for either side was not conclusive on any issue constituted reversible error because no witnesses testified for the defendants. Although sympathetic to some of defendants' concerns on appeal, we conclude that the grand jury was not used improperly and that neither of the alleged instructional errors were sufficiently prejudicial to merit reversal.

## I.

### Factual Background

After an initial investigation by the grand jury, Moss, an automobile dealer,

and his Virginia corporation, Corvette Center, were indicted along with others for conspiracy regarding the interstate transportation of stolen automobiles. Moss and Corvette Center were also charged with substantive counts concerning the theft and receipt of stolen parts and the sale of stolen automobiles. The defendants were, however, only convicted of selling and conspiracy to sell a stolen 1981 Corvette.

The evidence revealed that Moss ordered specific stolen automobiles from Dennis Murray, a Kentucky car thief. Moss ordered and obtained the 1981 Corvette from Murray to combine it with another stolen automobile he had already procured. The purpose of combining these two stolen vehicles was to produce a single saleable automobile that could not easily be traced to any outstanding stolen automobiles being sought by law enforcement officials. Such a process is known as vehicle or salvage "switching," and for those who regularly engage in this criminal endeavor, it is often very profitable.

Although the indictment was returned on May 12, 1983, the trial did not commence until November 7, 1983 because several continuances were granted. After the second trial continuance was granted, the government's attorney questioned two individuals before the grand jury: Donald Mason, an automobile rebuilder and salvage seller from North Carolina, and Bobby Clark, a North Carolina Division of Motor Vehicles Inspector. This inquiry concerned their apparent involvement in the defendants' conspiracy to sell stolen automobiles. According to the affidavit of John P. Alderman, the government's co-counsel, after the May indictment the government learned that Mason was a possible accomplice or co-conspirator of Moss. Continuing investigation by the FBI revealed that Mason appeared in the chain of title of the stolen Corvette and that he had obtained a "clean" North Carolina title for Moss. It thus became apparent that not only had the Corvette been stolen and its numbers switched, but the original Michigan salvage title had also been "laundered" and upgraded quickly in North Carolina. The launder-ing of title in North Carolina permitted the easy change in title back into saleable Virginia title. To accomplish this laundering of title, Mason misrepresented to the Division of Motor Vehicles in North Carolina that he was the true owner of the Corvette.

Mason and Clark's involvement in the conspiracy was not known until the FBI interviewed them on July 29th and August 1st of 1983. The information obtained in these interviews demonstrated Mason's responsibility for the laundering of title to numerous automobiles for Moss. With this information, the government ordered Mason and Clark before the grand jury to explore their involvement in Moss's auto theft scheme. In his affidavit, government co-counsel Alderman stated that he intended to supersede the Moss indictment by adding Mason as a co-conspirator thereby making him a co-defendant in the Moss trial. The Moss indictment, however, was never superseded because the government's evidentiary case against Mason was too weak to bring him to trial. Nevertheless, Mason and Clark did testify for the government at trial regarding the necessary salvage title trial although neither witness was impeached by any prior inconsistent statements made in their grand jury testimony.

## II.

### Propriety of the Post-Indictment Grand Jury Testimony

#### A. The Sole or Dominant Purpose Test

█ The defendants argue that the government abused the grand jury process by bringing Mason and Clark before the grand jury after Moss had already been indicted. The district court concluded that there was no abuse of the grand jury process because it was not used as a method of discovery by the government against Moss. We agree.

To protect the investigative function of the grand jury, we have recognized that "courts should not intervene in the grand jury process absent [a] compelling reason."

*In Re Grand Jury Subpoenas,* 581 F.2d 1103, 1108 (4th Cir.1978) *cert. denied,* 440 U.S. 971, 99 S.Ct. 1533, 59 L.Ed.2d 787 (1979); *see also United States v. (Under Seal),* 714 F.2d 347, 350 (4th Cir.), *cert. dismissed,* —— U.S. ——, 104 S.Ct. 1019, 78 L.Ed.2d 354 (1983). It thus follows that "[a] presumption of regularity attaches to a grand jury's proceedings and appellants have the burden of demonstrating that an irregularity occurred." *United States v. Woods,* 544 F.2d 242, 250 (6th Cir.1976), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 787, 50 L.Ed.2d 778 (1977). Although the courts firmly safeguard the investigatory power of the grand jury, it is the universal rule that prosecutors cannot utilize the grand jury solely or even primarily for the purpose of gathering evidence in pending litigation. *(Under Seal),* 714 F.2d at 349; *In re Grand Jury Proceedings (Johanson),* 632 F.2d 1033, 1041 (3d Cir.1980); *United States v. Zarattini,* 552 F.2d 753, 756 (7th Cir.), *cert. denied,* 431 U.S. 942, 97 S.Ct. 2661, 53 L.Ed.2d 262 (1977); *United States v. Sellaro,* 514 F.2d 114, 121–22 (8th Cir. 1973), *cert. denied,* 421 U.S. 1013, 95 S.Ct. 2419, 44 L.Ed.2d 681 (1975); *United States v. George,* 444 F.2d 310, 314 (6th Cir.1971); *United States v. Dardi,* 330 F.2d 316, 336 (2d Cir.1964). Once a defendant has been indicted, the government is precluded from using the grand jury for the "sole or dominant purpose" of obtaining additional evidence against him. *(Under Seal),* 714 F.2d at 350; *see also (Johanson),* 632 F.2d at 1041.

■ On the other hand, the government's " 'good faith inquiry into other charges [not included in the indictment] ... is not prohibited even if it uncovers further evidence against an indicted person.' " *Id.* (quoting *(Johanson* ), 632 F.2d at 1041; *accord Sellaro,* 514 F.2d at 122; *see also United States v. Braasch,* 505 F.2d 139, 147 (7th Cir.1974), *cert. denied,* 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975). Because the "grand jury's investigation is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed," *United States*

*v. Dionisio,* 410 U.S. 1, 13, 93 S.Ct. 764, 771, 35 L.Ed.2d 67 (1973), the sole or dominant purpose test is necessary to prevent any undue intrusion into the investigatory power of the grand jury. *Zarattini,* 552 F.2d at 757. Lacking clairvoyance, grand juries must be allowed to investigate freely individuals suspected of involvement in crimes for which indictments have already been issued. When applied correctly, the sole or dominant purpose test plainly permits grand juries to investigate additional individuals who become suspects only after an indictment has been returned, while precluding improper use of the grand jury for discovery. Unless the government's sole or dominant purpose in this case was to use the grand jury as a substitute for discovery when it questioned Mason and Clark before the grand jury, we cannot conclude that the grand jury process was abused.

### B.

### Applying the Sole or Dominant Purpose Test

■ The district court determined that the defendants failed to satisfy their burden of demonstrating that the *sole* or *dominant* purpose of the government in questioning Mason and Clark before the grand jury was to discover additional evidence against Moss. To the contrary, the district court found that the government's purpose for bringing Mason and Clark before the grand jury was to obtain sufficient evidence to prosecute Mason along with Moss. Like questions involving intent, the finding of a district court regarding the sole or dominant purpose of the government in bringing additional witnesses before the grand jury for post-indictment questioning may be reversed only if it is clearly erroneous. *See Pullman-Standard v. Swint,* 456 U.S. 273, 289–90, 102 S.Ct. 1781, 1790–91, 72 L.Ed.2d 66 (1982). After careful review of the evidence, we are convinced that the district court's findings regarding the government's sole or dominant purpose were not clearly erroneous. Accordingly, we affirm the district court's determination

that the government did not misuse the grand jury process.

## III.

### The Reasonable Doubt Instruction

■ The defendants contend that (1) the mere attempt to define reasonable doubt in a jury instruction constitutes reversible error, and even if such an instruction does not require automatic reversal, that (2) the particular explanation of reasonable doubt given in this case is sufficiently misleading to warrant reversal. We find neither of these arguments persuasive.

The defendants direct their complaint regarding the definition of reasonable doubt to the following portion of the jury instructions:

> Now, proof beyond a reasonable doubt, therefore, is proof of such a convincing character that you would be willing to rely upon it without hesitation in your most important affairs of your own.

(J.A. 168). The practice of defining reasonable doubt in the charge to the jury has been widely condemned. *Smith v. Bordenkircher,* 718 F.2d 1273, 1276 (4th Cir.1983); *Whiteside v. Parke,* 705 F.2d 869, 871 (6th Cir.), *cert. denied,* — U.S. ——, 104 S.Ct. 141, 78 L.Ed.2d 133 (1983); *United States v. Martin-Trigona,* 684 F.2d 485, 493 (7th Cir.1982); *Dunn v. Perrin,* 570 F.2d 21, 23 (1st Cir.), *cert. denied,* 437 U.S. 910, 98 S.Ct. 3102, 57 L.Ed.2d 1141 (1978); *see also Taylor v. Kentucky,* 436 U.S. 478, 488, 98 S.Ct. 1930, 1936, 56 L.Ed.2d 468 (1978). Even the Supreme Court has acknowledged that "[a]ttempts to explain the term 'reasonable doubt' do not usually result in making it any clearer to the minds of the jury." *Holland v. United States,* 348 U.S. 121, 140, 75 S.Ct. 127, 138, 99 L.Ed. 150 (1954). Recognizing that little can be gained from attempts to define reasonable doubt, while admitting that added confusion is often created by these well-intentioned judicial efforts, we join in the general condemnation of trial court attempts to define reasonable doubt in their jury instructions.

Mere attempts to define reasonable doubt do not, however, constitute reversible error per se. *See, e.g., Bordenkircher,* 718 F.2d at 1276; *United States v. Regilio,* 669 F.2d 1169 at 1178 (7th Cir.1981); *United States v. Rodriguez,* 585 F.2d 1234, 1240–42 (5th Cir.1978), *cert. denied,* 449 U.S. 835, 101 S.Ct. 108, 66 L.Ed.2d 41 (1980), *modified on other grounds sub nom. Albernaz v. United States,* 612 F.2d 906 (1980), *aff'd* 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981); *United States v. Magnano,* 543 F.2d 431, 436–37 n. 4 (2d Cir.1976), *cert. denied,* 429 U.S. 1091, 97 S.Ct. 1101, 51 L.Ed.2d 536 (1977); *United States v. Smith,* 468 F.2d 381, 383 (3d Cir.1972); *United States v. Christy,* 444 F.2d 448, 450–51 (6th Cir.), *cert. denied,* 404 U.S. 949, 92 S.Ct. 293, 30 L.Ed.2d 266 (1971). District courts are again admonished not to define reasonable doubt in their jury instructions, but merely because they do so does not require reversal. We reject, therefore, the defendants' argument that any attempt to define reasonable doubt in a jury charge requires automatic reversal.

The defendants also argue that the specific definition of reasonable doubt given in this case is sufficiently bewildering and misleading to warrant reversal. The Seventh Circuit has held that where a reasonable doubt definition misleads or confuses the average juror reversal is necessary. *Regilio,* 669 F.2d at 1178. We agree that at some point a reasonable doubt definition may be so incomprehensible or potentially prejudicial to require reversal.

■ To determine whether such confusion or prejudice exists, the challenged instruction on reasonable doubt must be viewed in the particular context in which it is given. *Baker v. United States,* 412 F.2d 1069, 1073 (5th Cir.1969), *cert. denied,* 396 U.S. 1018, 90 S.Ct. 583, 24 L.Ed.2d 509 (1970); *see also Bordenkircher,* 718 F.2d at 1277. So long as the definition in the charge correctly conveys the concept of reasonable doubt, the charge will not be considered prejudicial enough to permit reversal. *Holland,* 348 U.S. at 140, 75 S.Ct.

at 137; *Smith*, 468 F.2d at 383. The reasonable doubt definition given in this case emphasized that the degree of proof required for conviction had to be of "a convincing character" and that the jurors would have to be "willing to rely upon it without hesitation" in their "most important affairs." This instruction appears neither misleading nor confusing. It adequately conveyed the sometimes elusive concept of reasonable doubt and this was all that was required.[1]

In addition, the district court cautioned the jury in its charge that "the defendants are presumed to be innocent, and that presumption of innocence stays with them throughout every stage of the trial." (J.A. 167). The district court also informed the jury that "the government's burden of proof is a strict and heavy burden." (J.A. 167) These are precisely the type of ameliorating instructions that render harmless any confusion engendered by an unsuccessful attempt to define reasonable doubt. *See Bordenkircher*, 718 F.2d at 1277.

Even if we assume that the reasonable doubt definition given in this case tended to lessen the government's burden of proof, we find that the instructions on the presumption of innocence and the government's heavy burden of proof neutralized any possible prejudice resulting from the challenged definition.

### IV.

### The Number of Witnesses Instruction

■ The defendants presented no witnesses and no evidence at trial. Nevertheless, the district court gave the following number of witnesses instruction:

The weight of the evidence is not necessarily to be determined by the number of witnesses testifying to the existence or nonexistence of any fact. You may find that the testimony of a smaller number of witnesses as to a fact is more persuasive than that of a greater number of witnesses, or you may find that they are not persuasive at all.

(J.A. 172–173)

After the defendants objected and moved for a mistrial, the district court judge acknowledged that this instruction "probably was a round peg in a square hole," but because he found his error to be harmless he refused to take any remedial action. (J.A. 199).

Only *adverse* comment by the trial court judge on the defendant's refusal to testify warrants reversal. *Lakeside v. Oregon*, 435 U.S. 333, 338–39, 98 S.Ct. 1091, 1094–95, 55 L.Ed.2d 319 (1978). On its face, the district court's number of witnesses instruction was not an adverse comment on defendant's refusal to testify. Defendants argue, however, that such an instruction draws unnecessary and possibly prejudicial attention to their constitutionally protected decision not to present witnesses at trial.[2]

■ In *Lakeside*, the Supreme Court addressed the analogous issue of whether a protective instruction that the jury should not consider the defendant's failure to testify given over his objection constituted constitutional error. 435 U.S. at 333, 98 S.Ct. at 1092. The Supreme Court reasoned that the purpose of such an instruction was "to remove from the jury's deliberations any influence of unspoken adverse inferences," and therefore "[i]t would be

1. The reasonable doubt instruction given by the district court was a variant of a commonly used pattern jury instruction:

Proof beyond a reasonable doubt must therefore be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it in the most important of his own affairs.

1 E. Devitt & C. Blackmar, *Federal Jury Practice and Instructions* § 11.14 (3d ed. 1977). In this case the variance was merely grammatical and therefore not sufficient to require reversal. But

we suggest that whenever a jury request makes an instruction defining reasonable doubt necessary, district courts should accurately replicate the pattern jury instruction used to avoid any unnecessary confusion.

2. Although defendants' brief does not. clearly indicate the specific source of their claimed constitutional violation, the only constitutional right that the challenged instruction might have violated was the fifth amendment guarantee against compulsory self-incrimination.

strange indeed to conclude that this cautionary instruction violates the very constitutional provision it is intended to protect." [3] *Id.* at 339, 98 S.Ct. at 1095.

Like the protective instruction given in *Lakeside,* the number of witnesses instruction is intended to protect defendants who frequently have fewer witnesses testify than the government from any adverse inferences that might be drawn from this fact. Further, the defendant in *Lakeside* objected to the trial court's protective instruction because he feared that the instruction would draw needless attention to his failure to testify. *Id.* at 339–40, 98 S.Ct. at 1094–95. This is the same concern that the defendants had when they objected to the number of witnesses instruction given below. Consequently, this challenged instruction did not violate defendants' privilege against compulsory self-incrimination guaranteed by the fifth and fourteenth amendments.

Viewing the number of witnesses instruction in its entire context, we also conclude that this instruction was harmless error. First, it is unlikely that any jury would ever fail to notice that the defendants produced no witnesses at trial. Second, there is no greater prejudice to a defendant from a number of witnesses instruction given when he has no witnesses and the government has two compared to when the defendant has a single witness and the government has ten witnesses available. Nevertheless, the defendants' argument presumes that the former instruction would constitute reversible error, while the latter would not be considered error at all. Third, the possible prejudice resulting from the number of witnesses instruction was lessened because the district court informed the jury in the same instruction that the government's large number of witnesses need not be considered "persuasive at all." (J.A. 173). Finally, the district court repeatedly cautioned the jury that "[t]here is no requirement that any defendant produce any evidence or testify in any case." (J.A. 167). For these reasons, any effects from the district court's misplaced number of witnesses instruction were undeniably benign.

District courts should refrain from giving a number of witnesses instruction when the defendant has no witnesses. In this case, however, we are persuaded that the number of witnesses instruction was neither a violation of defendants' fifth amendment rights nor reversible error.

Accordingly, the decision of the district court is

AFFIRMED.

---

3. Regarding this same question, Judge Learned Hand answered: It is no doubt better if a defendant requests no charge upon the subject, for the trial judge to say nothing about it; but to say that when he does, it is error, carries the doctrine of self-incrimination to an absurdity." *Becher v. United States,* 5 F.2d 45, 49 (2d Cir. 1924), *cert. denied,* 267 U.S. 602, 45 S.Ct. 462, 69 L.Ed. 808 (1925).