**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                              No. 94-5107

ROBERT KEITH NEELY,
Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Virginia, at Roanoke.
Jackson L. Kiser, Chief District Judge.
(CR-92-78-R)

Argued: November 3, 1995

Decided: February 13, 1996

Before WIDENER, WILKINSON, and WILLIAMS, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Marvin David Miller, Alexandria, Virginia, for Appel-
lant. Thomas Ernest Booth, UNITED STATES DEPARTMENT OF
JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Thomas M.
Blaylock, Roanoke, Virginia, for Appellant. Robert P. Crouch, Jr.,
United States Attorney, Karen B. Peters, Assistant United States
Attorney, UNITED STATES DEPARTMENT OF JUSTICE, Wash-
ington, D.C., for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Robert Keith Neely appeals his convictions on money laundering and narcotics charges, contending that they are invalid on several grounds. Specifically, Neely claims that: (1) the district court erred in refusing to dismiss for prosecutorial misconduct; (2) the Government used documents in its investigation of Neely that he produced pursuant to a use-immunity order, in violation of Neely's Fifth Amendment right against compelled self-incrimination; (3) the Government knowingly allowed counsel laboring under an actual conflict of interest to represent Neely, in violation of his Sixth Amendment right to counsel; (4) the Government abused the grand jury process; (5) the district court erred in permitting two Government case agents to remain in the courtroom during trial; and (6) Neely's convictions on Counts Two and Three are mutually exclusive, requiring vacatur of the conviction on Count Three. We reject all of these contentions and accordingly affirm Neely's convictions.

I.

The evidence presented at trial, viewed in the light most favorable to the Government, Glasser v. United States, 315 U.S. 60, 80 (1942), establishes the following facts. Until his convictions, Neely was an attorney with a sole-practice law firm, R. Keith Neely, P.C., in Christiansburg, Virginia, specializing in criminal defense work. In May 1986, while representing one of several defendants in a complex drug conspiracy case, Neely met Donald Kimbler, a private investigator from Miami, Florida, who was working for another attorney involved in the same case. At that time, Kimbler, a former agent for the Bureau of Alcohol, Tobacco, and Firearms (ATF), was a small-scale cocaine dealer in the Miami area, but had never used cocaine himself. Kimbler and Neely quickly became close friends, and Neely introduced Kimbler to the use of cocaine.

2

At Kimbler's request, Neely introduced Kimbler to persons interested in purchasing cocaine. Neely arranged a meeting between Kimbler and Leigh Hurst, a drug dealer and longtime friend of Neely's. Hurst was wary of Kimbler's former connection to ATF, and refused to deal with Kimbler unless Neely acted as intermediary. Accordingly, Neely, Hurst, and Kimbler devised an arrangement pursuant to which Neely brokered cocaine transactions between Hurst and Kimbler. Neely simply was present during some transactions, but on other occasions Neely received cocaine from Kimbler and delivered it to Hurst, who gave money to Neely for delivery to Kimbler. In return for his efforts, Neely received approximately $200 per ounce from Kimbler, or one-third of Kimbler's profits; Neely also received 2.5 grams of cocaine from Hurst for every ounce Hurst purchased. Hurst estimated that he purchased eight pounds of cocaine from Kimbler through Neely from October 1986 through November 1987.

Neely also introduced Kimbler to Fred Roland "Butch" Franklin, III, a high-school classmate of Neely's. As with Kimbler and Hurst, Neely facilitated cocaine transactions between Kimbler and Franklin. Kimbler estimated that he sold approximately 4.56 pounds of cocaine to Franklin through Neely.

In 1987, Neely agreed to purchase a parcel of land near Claytor Lake in Pulaski County, Virginia for $50,000. Neely was to make a down payment of $8,000 and to pay the balance in quarterly installments of $4,200. Neely, evidently unable to meet this payment schedule, approached Kimbler and offered to make him a silent partner in the land purchase. Ultimately, Kimbler made the $8,000 down payment and agreed to alternate installment payments with Neely. However, Kimbler's name was not recorded on the deed to the property, nor was the agreement memorialized. Kimbler testified that the $8,000 used for the down payment came from a payment he had received for guarding a shipment of cocaine to Miami. Neely deposited the $8,000 into either his personal account or one of the law firm's corporate accounts, then drew a check on that account, payable to the seller of the land, for $8,000. This pattern of conduct was repeated for each quarterly payment made by Kimbler.

In August 1988, Kimbler and Neely had a disagreement concerning the payments on the property, as a result of which Kimbler ceased to

make quarterly installment payments. Shortly thereafter, Neely sought to make a new partnership arrangement with another friend, Michael Giacolone, for the purpose of continuing the payments. Giacolone gave Neely $42,000 in cash in exchange for a one-half interest in the property; this money represented profits from drug transactions. Neely instructed his secretary to deposit the $42,000 into his corporate and personal accounts in small increments in order to evade federal reporting requirements. Although Neely and Giacolone executed a partnership agreement, Giacolone's name was never recorded on the deed to the property.

The Government began to investigate Neely's activities in the late 1980s. In a 1990 case unrelated to the instant offenses, Neely pleaded guilty to misdemeanor possession of cocaine after he was videotaped using cocaine with a government informant. Also in 1990, Neely was indicted on charges of tampering with a grand jury, although he evidently was never prosecuted.[1]

A grand jury in the Western District of Virginia returned a fourteen-count, superseding indictment on September 22, 1992, charging Neely with racketeering, see 18 U.S.C.A. § 1962(c) (West 1984) (Count One) (including six acts of racketeering); conspiracy to aid and abet the distribution of marijuana and cocaine, to possess with intent to distribute marijuana and cocaine, and to distribute marijuana and cocaine, see 18 U.S.C.A. § 2 (West 1969), 21 U.S.C.A. § 841(a)(1) (West 1981) (Count Two); aiding and abetting the distribution of cocaine, see 18 U.S.C.A. § 2, 21 U.S.C.A. § 841 (Count Three); money laundering, see 18 U.S.C.A.§ 1956(a)(1)(B)(i) (West Supp. 1995) (Counts Four through Nine);[2] distribution of marijuana,

_____

[1] The district court dismissed the indictment because the prosecution failed to provide exculpatory evidence to the grand jury. The Government appealed, and we reversed on the authority of United States v. Williams, 504 U.S. 36 (1992) (holding that prosecutor is not required to present exculpatory evidence to the grand jury). See United States v. Neely, 966 F.2d 1445 (4th Cir. 1992) (per curiam) (unpublished), cert. denied, 113 S. Ct. 1261 (1993). Although the record before us is unclear, apparently the Government did not re-indict Neely.

[2] Counts Four and Five related to Neely's dealings with Kimbler regarding the Claytor Lake property. Counts Six through Nine charged Neely with money laundering related to his various dealings with Giacolone, including the $42,000 paid by Giacolone for a one-half interest in the Claytor Lake property (Count Seven).

4

see 21 U.S.C.A. § 841(a)(1) (Count Ten); accessory after the fact to Giacolone's drug offenses, see 18 U.S.C.A.§ 3 (West Supp. 1995) (Counts Eleven and Twelve); tampering with a witness, see 18 U.S.C.A. § 1512 (West Supp. 1995) (Count Thirteen); and criminal forfeiture of certain assets and property, see 18 U.S.C.A. § 982 (West Supp. 1995) (Count Fourteen). The district court dismissed Counts Twelve and Thirteen and one act of racketeering prior to trial, and Neely proceeded to trial on the remaining counts. After a two-week trial, the jury convicted Neely of conspiracy to possess cocaine for personal use (the lesser included offense of Count Two), aiding and abetting the distribution of cocaine (Count Three), money laundering (Count Seven), and distribution of marijuana (Count Ten).**3** The district court sentenced Neely to 121 months imprisonment, but released him on bond pending appeal.

Throughout the pretrial proceedings, trial, and post-trial proceedings, Neely filed a plethora of motions seeking to exclude evidence or to dismiss the indictment altogether. Although Neely has been somewhat more selective in his arguments on appeal, he nevertheless asserts a broad array of reversible errors. We address these contentions seriatim.

II.

Neely first asserts that the district court erred in denying his numerous motions to dismiss the indictment for prosecutorial misconduct.**4** Relying in part on the precept that, "while [the prosecutor] may strike hard blows, he is not at liberty to strike foul ones," Berger v. United States, 295 U.S. 78, 88 (1935), overruled on other grounds by Stirone v. United States, 361 U.S. 212 (1960), Neely urges us to vacate his convictions on two grounds. First, Neely claims that the Government committed certain acts of misconduct during the course of the investigation and preparation of the case against Neely. Second, Neely claims that the Government withheld numerous pieces of exculpatory

_____

**3** Neely's conviction for distribution of marijuana was based on his provision of marijuana to Shirley Bassett, a friend.
**4** Neely moved to dismiss the indictment based on allegations of prosecutorial misconduct and withholding of exculpatory evidence no fewer than five times.

5

evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963), and its progeny.

The duty of the Government is not to obtain a conviction, but rather is to ensure that justice is achieved. Berger, 295 U.S. at 88. Justice is not obtained, and reversal is required, when improper conduct by the prosecutor "so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainright, 477 U.S. 168, 181 (1986) (internal quotation marks omitted). In order to obtain reversal of his convictions based on misconduct by the Government, Neely must satisfy a two-prong test: "`(1) the prosecutor's remarks or conduct must in fact have been improper, and (2) such remarks or conduct must have prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial.'" United States v. Brockington, 849 F.2d 872, 875 (4th Cir. 1988) (quoting United States v. Hernandez, 779 F.2d 456, 458 (8th Cir. 1985)). To the extent that the district court makes factual findings regarding a defendant's claims of prosecutorial misconduct, our review is for clear error; in the absence of such findings, however, our review is plenary. United States v. McDonald, 61 F.3d 248, 253 (4th Cir. 1995). We first examine the acts of misconduct alleged by Neely and then proceed to an examination of his Brady claims.

A.

Neely claims that the Government committed three acts of misconduct during the investigation and preparation of the case against him. First, Neely contends that the Government violated its duty to inform the district court of the existence of a conflict of interest when it knowingly permitted Neely's former attorney, James C. Turk, Jr., to represent Hurst despite Turk's knowledge that Hurst intended to testify against Neely. See United States v. Tatum , 943 F.2d 370, 379-80 (4th Cir. 1991) ("[W]hen a conflict situation becomes apparent to the government, the government has a duty to bring the issue to the court's attention and, if necessary, move for disqualification of counsel."). We address this purported conflict in more detail in Part IV, infra. For purposes of addressing Neely's prosecutorial misconduct claim, we need only note that Turk did not represent Neely on the instant charges; thus, any conflict that may have existed was not related to this case, and, even if the Government did have a duty to

6

inform the court of the presence of a conflict, that duty did not exist in this case. See generally Hoffman v. Leeke, 903 F.2d 280, 285-86 (4th Cir. 1990) (delineating circumstances in which attorney faces actual conflict of interest).

Second, Neely maintains that the Government violated his Sixth Amendment right to counsel when it, knowing that Neely was represented by counsel on pending charges of grand jury tampering, equipped Hurst with a recording device and tape-recorded two conversations between Neely and Hurst. See Massiah v. United States, 377 U.S. 201 (1964) (holding that covert interrogation of defendant after right to counsel has attached violates Sixth Amendment). Of course, Neely is correct that, under Massiah, "[a]ny secret interrogation of the defendant, from and after the finding of the indictment, without the protection afforded by the presence of counsel" is a violation of the defendant's Sixth Amendment right to counsel. Id. at 205 (internal quotation marks omitted). The Sixth Amendment right to counsel, however, "is offense specific. It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced," e.g., upon the return of an indictment. McNeil v. Wisconsin, 501 U.S. 171, 175 (1991); see also Kirby v. Illinois, 406 U.S. 682, 689 (1972) (stating that the Sixth Amendment right to counsel attaches upon "the initiation of adversary judicial criminal proceedings--whether by way of formal charge, preliminary hearing, indictment, information, or arraignment"). Accordingly, the mere fact that an individual has been indicted for a criminal offense does not preclude the investigation of other suspected criminal activity:

> The police have an interest . . . in investigating new or additional crimes [after an individual is formally charged with one crime.] . . . [T]o exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at that time, would unnecessarily frustrate the public's interest in the investigation of criminal activities.

Maine v. Moulton, 474 U.S. 159, 179-80 (1985); see also id. at 180 n.16 ("Incriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are, of course,

7

admissible at a trial of those offenses."); United States v. Kidd, 12 F.3d 30, 32 (4th Cir. 1993) (same), cert. denied , 114 S. Ct. 1629 (1994).

Neely's claim that the Government violated Massiah is based on the fact that he was represented by counsel at the time of the tape-recorded conversations with Hurst. When the tape-recorded conversations occurred, however, Neely was represented by counsel on charges of conspiracy to defraud the United States by interfering with grand jury secrecy, see 18 U.S.C.A. § 371 (West 1966 & Supp. 1995), obstruction of justice, see 18 U.S.C.A.§ 1503 (West Supp. 1995), and criminal contempt, see 18 U.S.C.A. § 401(3) (West 1966).[5] United States v. Neely, 966 F.2d 1445 (4th Cir. 1992) (per curiam) (unpublished), cert. denied, 113 S. Ct. 1261 (1993), but had not yet been indicted on the instant charges. Hence, although any incriminating statements made by Neely with respect to the pending charges would have been inadmissible, any incriminating statements made by Neely relating to allegations not yet charged would have been admissible against Neely at a trial on those charges. See United States v. DeVillio, 983 F.2d 1185, 1190-91 (2d Cir. 1993) (affirming admission of incriminating statements related to uncharged offense that were obtained after defendants had been indicted for another crime). Indeed, DeVillio is particularly instructive in light of the fact that in that case, the defendants made incriminating statements that related to both charged and uncharged offenses during the course of a covertly recorded conversation between the defendants and a codefendant acting as a government informant. In holding that the statements related to the uncharged crime were admissible, the Second Circuit implicitly concluded that the inadmissibility of the statements related to the charged offense did not taint statements regarding the uncharged offense. See id. at 1191. Hence, for the Government to tape record Hurst's conversations with Neely in an effort to obtain evidence against Neely for use in prosecuting him on the instant charges was not improper.[6]

_____

[5] At the time of the recorded conversations, the district court had dismissed these charges, and the Government's appeal was pending before this court.

[6] Even if the Government's conduct had been improper, the impropriety could not have denied Neely a fair trial because the district court excluded from evidence the tape-recorded conversations.

8

Third, Neely posits that the Government deliberately misled the district court and his attorneys respecting Kimbler's condition and ability to travel. According to Neely, the Government claimed that Kimbler was too ill to travel from a federal prison in Missouri to Roanoke, Virginia to be deposed; accordingly, Neely's attorneys travelled to Missouri to take Kimbler's deposition. Upon arriving, they discovered that Kimbler was to be transferred to a federal prison in Florida for a hearing on a motion to be released from custody. In short, Neely argues, the Government misled the district court and defense counsel about the need to travel to Missouri. Of course, if Neely's allegations are true, substantial questions are raised concerning the Government's conduct, and, unfortunately, the Government does not dispute the factual basis of this claim. Nevertheless, even if we were to assume that the Government acted improperly, we would not reverse Neely's convictions because Neely made no showing that the misconduct so prejudiced him as to deny him a fair trial. See Brockington, 849 F.2d at 875. Indeed, the fact that Kimbler was deposed by Neely's defense counsel prior to trial indicates that any prosecutorial misconduct with respect to representations about Kimbler's location and condition did not deprive Neely of a fair trial.

B.

Neely also contends that the Government's repeated failure to turn over exculpatory evidence was a part of a pattern of misconduct and that this misconduct constituted a due process violation. Neely alleges five instances of nondisclosure by the Government: (1) impeachment evidence regarding Hurst's conviction for perjury, his use of narcotics, and his illegal narcotics-dealing activities; (2) impeachment materials related to Kimbler, including a tape recording of a debriefing of Kimbler by federal agents regarding Kimbler's participation in an interstate drug ring; (3) impeachment materials relevant to the testimony of Jamel Agemy, a Government witness; (4) information relating to the Government's seeking early release and a reduction in fine for Giacolone in exchange for his testimony; and (5) information regarding a statement by Gary Duncan, an individual on the Government's witness list, that Duncan and Kimbler had not used drugs together. We address these challenges in turn, keeping in mind that a determination of whether the Government acted improperly necessarily requires a determination of whether any Brady violation in fact

9

occurred; if there was no Brady violation, the Government's conduct cannot be considered improper.

Brady v. Maryland, 373 U.S 83 (1963), and its progeny require that the Government disclose to the defense all material evidence that is favorable to the accused. This duty applies equally to evidence that is directly exculpatory and to evidence that allows the defendant to impeach a witness. See United States v. Bagley , 473 U.S. 667, 676 (1985). However, the Government has no duty to disclose evidence that could have been discovered through the exercise of due diligence by the defendant. See United States v. Wilson , 901 F.2d 378, 380 (4th Cir. 1990). Thus, there is no Brady violation if "the exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked." Id. at 381.

Not every failure to disclose favorable information requires that the defendant's conviction be vacated; rather, "the suppression by the prosecution of evidence favorable to an accused . . . violates due process [only] where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87. Evidence is material"if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682. A "reasonable probability" of a different result exists "when the Government's evidentiary suppression `undermines confidence in the outcome of the trial.'" Kyles v. Whitley , 115 S. Ct. 1555, 1566 (1995) (quoting Bagley, 473 U.S. at 678).

With respect to Neely's first alleged instance of nondisclosure, we note that this claim relates to the Government's failure to disclose evidence that could be used to impeach Hurst during a hearing regarding pre-trial detention. Brady, however, is concerned only with the question of whether the defendant received a fair trial. Because Neely does not claim that the Government failed to provide the information in sufficient time for it to be used at trial, see United States v. Smith Grading & Paving, Inc., 760 F.2d 527, 532 (4th Cir.), cert. denied, 474 U.S. 1005 (1985), we conclude that Neely's first allegation of nondisclosure does not state a cognizable Brady  claim.

Similar reasoning applies to Neely's second claim of nondisclosure, which relates to the Government's alleged failure to provide,

10

prior to the taking of Kimbler's deposition, a tape recording of a debriefing of Kimbler that revealed his involvement in an interstate drug conspiracy and a murder-for-hire scheme. Even if Neely did not receive the tape recording prior to Kimbler's deposition (a fact that is not at all clear), the parties do not dispute that the recording was provided to defense counsel well in advance of trial. As noted above, the fact that Neely received the tape recording in time to use it at trial precludes a Brady claim.

With respect to Neely's third allegation of nondisclosure, the district court found that the Government's failure to disclose two investigation reports containing information useful in impeaching Agemy constituted a Brady violation and, accordingly, excluded Agemy's testimony. Obviously, the fact that Agemy never testified precludes a finding that the Brady violation related to Agemy's testimony undermines confidence in the verdict.

Neely's fourth contention is that the Government failed to reveal that Giacolone was promised early release from prison and a reduction in fine in exchange for his testimony. The Government argues that this contention lacks a factual basis, claiming that Giacolone in fact received only a two-week furlough so that he could help the Government prepare its case and that no agreement existed between the Government and Giacolone regarding a reduction in Giacolone's fine. Furthermore, the Government asserts, any promises made to Giacolone could have been discovered through diligent cross-examination of Giacolone. Because this information could have been discovered through due diligence by defense counsel, the Government posits, it had no duty under Brady to disclose it. We agree with the Government that any promises actually made to Giacolone could have been discovered by defense counsel during cross-examination. Additionally, we note that Brady does not necessarily require that exculpatory information be produced prior to trial; provided the information is discovered in time for its effective use by the defense, there is no Brady violation. See Smith Grading & Paving, 760 F.2d at 532 (holding that disclosure of exculpatory evidence during cross-examination of first Government witness did not violate Brady). Therefore, we conclude that there is no Brady violation here because Neely himself, through the exercise of due diligence, could have obtained information regard-

11

ing any promises made to Giacolone in time to use it effectively at trial.

Finally, Neely claims that the Government violated Brady by concealing a statement by Duncan that he had never used cocaine with Kimbler. Neely argues that this statement would have allowed him to impeach Kimbler's testimony. While this may or may not be true, Neely cannot show that Duncan's statement was material to his defense. Neely employed a host of impeachment material during his cross-examination of Kimbler, most of it far more damning than Duncan's statement. Accordingly, we conclude that assuming the Government was obligated to disclose Duncan's statement to the defense, the failure to do so does not give rise to a reasonable probability that, had the statement been disclosed, the outcome of the trial would have been different.

III.

Second, Neely maintains that his convictions were obtained in violation of his Fifth Amendment right against compelled self-incrimination. Specifically, Neely contends that he produced two sets of documents pursuant to immunity orders and that the Government violated those immunity orders by: (1) using documents to prepare its case against Neely; (2) referring to Neely as the source of documents before the grand jury; and (3) referring to Neely as the source of documents at trial. We conclude that none of these claims has merit.

The Fifth Amendment provides in part that no person"shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Supreme Court has held repeatedly that the contents of voluntarily prepared business records are not protected by the Fifth Amendment because, while possibly incriminating, their creation was not compelled. See, e.g., United States v. Doe, 465 U.S. 605, 610 (1984) ("[T]he Fifth Amendment protects the person asserting the privilege only from compelled self-incrimination. Where the preparation of business records is voluntary, no compulsion is present." (citation & footnote omitted)); Fisher v. United States, 425 U.S. 391, 409 (1976) ("[T]he Fifth Amendment would not be violated by the fact alone that [an accountant's workpapers] on their face might incriminate the [defendant], for the privilege protects a person only

12

against being incriminated by his own compelled testimonial communications. . . . Furthermore, . . . the preparation of all of the papers sought in these cases was wholly voluntary . . . ." (citations omitted)).

Whether the act of producing business records has independent testimonial significance and may not be compelled absent a grant of immunity coextensive with the privilege is, however, another question. Thus, even though the contents of business records are not protected,

> "[t]he act of producing evidence in response to a subpoena nevertheless has communicative aspects of its own, wholly aside from the contents of the papers produced. Compliance with the subpoena tacitly concedes the existence of the papers demanded and their possession or control by the [defendant]. It would also indicate the [defendant's] belief that the papers are those described in the subpoena. The elements of compulsion are clearly present, but the more difficult issues are whether the tacit averments of the[defendant] are both `testimonial' and `incriminating' for purposes of applying the Fifth Amendment. These questions perhaps do not lend themselves to categorical answers; their resolution may instead depend on the facts and circumstances of particular cases or classes thereof."

Braswell v. United States, 487 U.S. 99, 103 (1988) (quoting Fisher, 425 U.S. at 410) (citation omitted). According to the Braswell court, the custodian of corporate records does not possess a Fifth Amendment privilege against the production of those records, because he holds those records only as a representative of the organization. See id. at 104. However, in the case of a sole proprietorship, Braswell holds that, under Doe, the custodian of the records must "be provided the opportunity to show that his act of production would entail testimonial self-incrimination." Id. If the custodian makes such a showing, the Government cannot compel production of the records unless it first grants the custodian immunity coextensive with the scope of the privilege. See Kastigar v. United States, 406 U.S. 441, 449 (1972). The district court's conclusion with respect to whether an individual is entitled to immunity for his act of producing business records is a

13

finding of fact that we may overturn only if it is unsupported by the record. See Doe, 465 U.S. at 613-14.

In December 1990, the grand jury issued a subpoena addressed to "ROBERT KEITH NEELY, ESQ., Custodian of Records for sole practice law firm" requesting "ANY AND ALL client related records and documents . . . relative to Michael Giacolone, Jamel Agemy, James Regan for the period 1980 to September 1990." (J.A. at 508, 510) (Document Set One.) Neely moved to quash the subpoena, arguing that the documents were protected by attorney-client privilege and that being required to produce the records would violate his Fifth Amendment right against compelled self-incrimination. After the district court granted the motion to quash, Neely agreed to produce the documents pursuant to a grant of immunity. Thereafter, at the Government's request, the district court entered an order granting Neely immunity for "testimony or . . . other information which he refuses to give or to provide on the basis of his privilege against self incrimination." (J.A. at 543-44.) Neely then produced the documents.

In May 1991, the grand jury served another subpoena, addressed to "Keith Neely, Custodian of Records, R. Keith Neely, P.C.," seeking "ANY AND ALL records, files, [etc.] . .. maintained by the R. Keith Neely law firm" related to the purchase of the Claytor Lake property and to Kimbler, Hurst, and Franklin. (J.A. at 1151, 1153) (Document Set Two.) Neely moved to quash this subpoena; in response, the Government moved for an order of act-of-production immunity. After examining the subpoenaed documents in camera, the district court granted in part Neely's motion to quash. The district court held that some of the documents were subject to attorney-client privilege and that the compulsory production of others would violate Neely's right against compelled self-incrimination. With respect to the rest, the district court concluded that the documents were corporate papers not protected by the Fifth Amendment. **7** Neely subse-

_____

**7** The district court's rulings with respect to the two sets of documents leave some question as to whether it viewed R. Keith Neely, P.C. as a sole proprietorship or as a corporation. We need not resolve this ambiguity because the contents of the subpoenaed documents were not privileged under either characterization and because we conclude that, assuming Neely's act of producing the documents was protected by a Fifth-Amendment privilege, any reference to Neely as the source of the documents was harmless beyond a reasonable doubt.

14

quently produced these documents.**8**

Neely argues that the district court granted him use immunity for the contents of Document Set One, and therefore claims that the Government violated his right against compelled self-incrimination in showing the documents to two witnesses, Giacolone and Tangie Vest, a former employee of Neely's, to help the Government prepare for trial. In response, the Government argues first, that the order grants Neely only act-of-production immunity, and second, that even if the order did grant use immunity, the documents are corporate records and therefore not protected by the Fifth Amendment. After a lengthy hearing on this issue, the district court found that Neely "would enjoy immunity as to any act of production, but not as to the contents of the documents produced. While the order granting immunity was broad enough to cover any activity or testimony of the defendant, the evidence shows that the only testimonial act the defendant performed was producing the records." (J.A. at 663.)

We cannot conclude that the district court's finding that Neely's only testimonial act was the production of Document Set One is clearly erroneous. See Doe, 465 U.S. at 613-14. The subpoena clearly sought business records of the law firm, and Neely does not dispute that those records were created voluntarily. Accordingly, Neely possessed no Fifth Amendment right with respect to the contents of those documents. See id. at 610. And, given that Neely operated his law firm as a sole practitioner, the district court's finding that Neely was entitled to immunity for his act of producing the documents is not clearly erroneous. Thus, although the Government was barred from using Neely's act of producing Document Set One against him, it was free to use the contents of Document Set One to prepare its case against Neely.**9**

_____

**8** We can find no support in the record for Neely's assertion that the district court granted the Government's motion for act-of-production immunity. The document to which Neely points, (see J.A. at 562-63), is simply a draft order submitted by the Government with its motion. The draft order was never signed by the district court.

**9** Neely argues that, having granted him use immunity, the Government was required to show that none of the evidence offered against Neely at

15

The district court's finding that Neely was entitled to immunity for his act of producing Document Set One necessarily means that Agent Higginbotham acted improperly when he referred to Neely as the source of Document Set One before the grand jury that received those documents. Indeed, the Government does not dispute that Agent Higginbotham's comments violated Neely's Fifth Amendment right. Rather, the Government contends that the violation was harmless beyond a reasonable doubt and reversal of Neely's convictions therefore is not required. See United States v. Harris, 973 F.2d 333, 338 (4th Cir. 1992) (noting that use of compelled testimony does not require reversal if error is harmless beyond a reasonable doubt). In advancing this contention, the Government rightly points out that, in addition to the fact that the Government reminded the grand jury that it was not to consider that Neely had produced the documents, the grand jury that indicted Neely was not the same grand jury that received the records, and no improper references were made to Neely as the source of Document Set One before the grand jury that actually indicted him. Under these circumstances, we conclude that neither Neely's indictment nor his trial suffered even the slightest taint from the improper references and that the error was harmless beyond a reasonable doubt.

Neely also contends that reversal of his convictions is required because IRS Agent Suzanne Hines, who testified at trial regarding various financial records including several checks that had been produced pursuant to one of the grand jury subpoenas, referred to "the defense" as the source of the checks. (J.A. at 871WW.) According to Neely, Hines's statement requires reversal of his convictions because it referred to Neely's testimonial act of producing the documents, thereby violating his right against compelled self-incrimination. The Government concedes that Hines's statement constituted error but maintains that the district court correctly determined that this error was harmless beyond a reasonable doubt.

_____

trial was derived from the contents of Document Set One. See Kastigar, 406 U.S. at 460. Because the documents were not privileged, however, there was no prohibition against the Government using them to prepare its case against Neely. Neely's claim that the Government failed to meet its burden under Kastigar is therefore misplaced.

16

In concluding that Hines's reference to Neely as the source of documents was harmless beyond a reasonable doubt, the district court employed the test of Williams v. Zahradnick, 632 F.2d 353, 361-62 (4th Cir. 1980). Under Williams, the determination of whether an error is harmless beyond a reasonable doubt depends on five factors: (1) the use to which the Government put the improper reference; (2) "[w]ho elected to pursue the line of questioning"; (3) "[t]he quantum of other evidence indicative of guilt"; (4) "[t]he intensity and frequency of the reference"; and (5) "[t]he availability to the trial judge of an opportunity to grant a motion for mistrial or to give curative instructions." Id. The district court concluded that none of these factors weighed in favor of reversal, noting that the reference was brief, equivocal, and inadvertent; that the evidence of Neely's guilt was substantial; and that the court had considered and rejected the options of a mistrial or a curative instruction.[10]  The district court was in the best position to observe the impact of Agent Hines's remark in the context of the trial as a whole. Hence, we are reluctant to disturb the district court's carefully considered ruling that the error was harmless beyond a reasonable doubt. Moreover, our review of the record leaves us with no doubt as to the fleeting nature of the reference and its minimal significance when considered in light of all of the evidence presented during the lengthy trial. We therefore agree with the district court that this error does not warrant reversal because it was harmless beyond a reasonable doubt.

IV.

Next, Neely mounts a Sixth Amendment challenge to his convictions. Specifically, he posits that he was deprived of his Sixth Amendment right to counsel because the Government knowingly allowed his former attorney to represent one of the Government's witnesses on charges unrelated to the investigation of Neely. According to Neely, the Government failed to disclose to the district court a known conflict of interest, thereby resulting in Neely's being represented by counsel with an actual conflict of interest. Neely asserts that this vio-

---

[10] The district court stated that it elected not to give a curative instruction because it feared that the cure would be worse than the disease, i.e., that the curative instruction would draw more attention to the error than it warranted.

17

lation of his Sixth Amendment right to counsel entitles him to a new trial.

The district court held a lengthy hearing on Neely's Sixth Amendment claim, at which the following facts were adduced. The Government's investigation of Neely, led by FBI Agent Gerald Fayed and IRS Agent Hines, began sometime in the late 1980s. In 1990, Neely pleaded guilty to misdemeanor cocaine possession. Neely was represented in the case by his friend Turk. Neely was placed on probation after his guilty plea; at this point Turk believed that his representation of Neely had ended.

In March 1992, Neely contacted Turk and requested that Turk represent Hurst, who had been charged with money laundering and released on bond. Turk undertook the representation only after being assured by both Neely and Hurst that no conflict of interest existed. At approximately the same time, Turk made several inquiries to the court and to the probation office regarding the possibility of an early release from probation for Neely. Turk avowed that he made the inquiries as a favor to Neely, not as his counsel, emphasizing to the district court that he informed Neely that he was not representing Neely at that time. Turk's last activity regarding Neely's probation status occurred on April 15, 1992.

Shortly after he agreed to represent Hurst, the Government informed Turk of its belief that Hurst, Neely, and Kimbler had participated jointly in drug-related activities and offered the possibility of a reduced sentence for Hurst if he agreed to testify against Neely. Additionally, Turk reviewed discovery material in the Government's possession and found an affidavit by Kimbler indicating that Hurst and Neely might be linked to drug trafficking. In response to Turk's inquiry, Hurst stated that he did not want to testify against Neely, but did not admit or deny the truth of the Government's allegations regarding his association with Neely. According to Turk, Neely repeatedly contacted him regarding the Hurst case, making inquiries and suggesting strategies in a manner that made Turk suspect that "Neely was trying to manipulate Hurst's defense in order to protect himself." (J.A. at 1358.)

On May 12, 1992, the Government moved to revoke Hurst's bond on the basis of a urinalysis that tested positive for cocaine use. Hurst

18

informed Turk that Neely gave him the cocaine that had resulted in the positive urinalysis and told Turk that he now wished to testify against Neely. At that point, Turk informed Hurst that he could no longer serve as his attorney and advised him to seek new counsel. Before officially withdrawing as counsel, however, Turk attended a meeting between Hurst and the Government to negotiate a plea agreement. After the meeting, Hurst met with Government investigators several more times and met with Neely while wearing a recording device. Turk stated that he had no specific knowledge of these activities and that he did not provide Hurst with any legal advice regarding them. Turk was present at Hurst's plea hearing because Hurst's substitute counsel was unavailable. At that time, Turk informed the court of the conflict and formally withdrew as counsel.

Prior to trial, Neely moved to suppress Hurst's testimony on the basis that Turk's simultaneous representation of Hurst (on money laundering charges unrelated to Neely) and Neely (on early release from probation) violated Neely's right to counsel in this case. The district court held a lengthy hearing at which Turk and others testified. Ruling from the bench, the district court concluded that, regardless of Turk's view that he was not "representing" Neely with respect to Neely's probation status, Turk remained Neely's counsel throughout Turk's representation of Hurst. The court also opined, however, that Neely's Sixth Amendment right with respect to the instant charges was not implicated by the dual representation because Neely had not yet been indicted. Additionally, the district court held that any prejudice to Neely from the dual representation affected only Neely's possible early release from probation, not the pending charges.

That a defendant's Sixth Amendment right to counsel includes the right to counsel free from serious conflicts of interest is beyond question. See Hoffman, 903 F.2d at 285. A defendant's right to counsel has been violated when an "actual conflict of interest adversely affect[s] his lawyer's performance." Id. at 286 (internal quotation marks omitted). Such a conflict exists when an attorney simultaneously represents two individuals whose interests are adverse. See id. at 285.

Neely's Sixth Amendment claim is patently without merit. Assuming that Turk labored under an actual conflict of interest in his simultaneous representation of Hurst and Neely, this conflict related only

19

to Turk's representation of Neely on the cocaine-possession matter. Because Turk did not represent Neely on the instant charges -- indeed, the conflict was resolved before Neely was even indicted on these charges -- Neely was not represented by counsel laboring under an actual conflict of interest, and could not have suffered a deprivation of his right to counsel.

V.

Neely further contends that the Government abused the grand jury process by commencing a grand jury investigation of Franklin before Neely's trial took place. According to Neely, the investigation of Franklin was a mere pretext for the Government's real purpose, namely acquiring more evidence against Neely. The Government counters that its investigation of Franklin was legitimate. We find Neely's claim to be without merit.

A court should not intervene in the grand jury process absent a compelling reason. See United States v. Dionisio , 410 U.S. 1, 16-18 (1973). A presumption of regularity attaches to grand jury proceedings, and Neely has the burden of showing that this presumption is unwarranted. See United States v. Moss, 756 F.2d 329, 332 (4th Cir. 1985). While the Government may not utilize a grand jury "solely or even primarily for the purpose of gathering evidence in pending litigation," id., the existence of a pending indictment does not preclude the Government from using a grand jury to make a good-faith inquiry into charges not included in the indictment, id. Provided investigation of the defendant is not the Government's "sole or dominant purpose" in convening the grand jury, no abuse of the grand jury process has occurred. Id. The advantage of this rule is that it allows grand juries to conduct continuing investigations without waiting to indict persons against whom sufficient evidence to indict has been obtained:

> Lacking clairvoyance, grand juries must be allowed to investigate freely individuals suspected of involvement in crimes for which indictments have already been issued. When applied correctly, the sole or dominant purpose test plainly permits grand juries to investigate additional individuals who become suspects only after an indictment has been

20

returned, while precluding improper use of the grand jury for discovery.

Id. The district court's determination regarding the Government's sole or dominant purpose in conducting a grand jury investigation is a factual finding, which we review only for clear error. Id.

Franklin was named, but not indicted, in the indictment charging Neely. After the indictment was returned, but before Neely's trial, a grand jury was convened to investigate Franklin on charges unrelated to the Neely indictment. Immediately upon learning of the investigation, Neely filed an emergency motion to enjoin the grand jury proceedings. The district court held an emergency hearing on Neely's motion, during which Neely asserted his belief that the investigation of Franklin was being used as a discovery device in the Government's case against Neely. In response, the Government proffered, under seal, its reasons for investigating Franklin. Agent Fayed testified that the grand jury's investigation of Franklin was related to Franklin's suspected distribution of marijuana and cocaine and that the Government had proceeded with its investigation of Franklin because its key witness, Kimbler, was suffering from terminal cancer, making it necessary to secure his testimony for trial in the form of a videotaped deposition. The Government, therefore, had to determine whether there was sufficient evidence against Franklin to indict him so that he could be present during the deposition.

Based on this information, the district court concluded that the Government's investigation of Franklin was conducted in good faith, and that the investigation was not being carried out for the sole or dominant purpose of acquiring evidence against Neely. We cannot say that this finding was clearly erroneous, and accordingly, decline to reverse Neely's convictions on this basis.

VI.

Neely next maintains that the district court committed reversible error by allowing the Government to designate two case agents, Agents Fayed and Hines, both of whom were exempted from the

21

district court's order sequestering witnesses. See Fed. R. Evid. 615.[11] While we agree with Neely that an error was committed, we find the error harmless.

Rule 615 provides for the exclusion of witnesses at the request of a party. Exclusion is a matter of right; once a request is made, the court "shall" sequester the witnesses. Id. ; see United States v. Farnham, 791 F.2d 331, 334-35 (4th Cir. 1986). Rule 615 is designed to aid the truth-seeking process by denying the opportunity for witnesses to collude or for one witness to tailor his testimony to the testimony of another. See id. at 334-35. Every witness need not be excluded, however. Rule 615 exempts from sequestration: (1) a party who is a natural person; (2) a designated representative of a party that is not a natural person; and (3) a person whose presence is essential to the presentation of the case. Fed. R. Evid. 615. That the Government's investigating agent may be exempted from sequestration pursuant to Rule 615(2) is beyond dispute, see United States v. Parodi, 703 F.2d 768, 773 (4th Cir. 1983); that the Government may designate only one such agent is equally clear. Farnham, 791 F.2d at 335.

The Government erroneously relies on United States v. Kosko, 870 F.2d 162, 164 (4th Cir.), cert. denied, 491 U.S. 909 (1989), for the proposition that "a district court may permit two case agents to remain in the courtroom if their testimony does not overlap and undermine the integrity of the fact-finding process." (Appellee's Brief at 35.) In Kosko, we affirmed the district court's ruling allowing a DEA agent and an IRS agent, both of whom had participated in the investigation of the defendant, to remain in the courtroom during trial because the latter agent was present in the courtroom as an expert witness whose presence was essential to the presentation of the Government's case.

_____

[11] Rule 615 provides:

> At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause.

22

Kosko, 870 F.2d at 164; see Fed. R. Evid. 615(3). Indeed, Kosko explicitly reaffirmed the holding of Farnham that the Government may designate only one case agent as its representative. Kosko, 870 F.2d at 164. Regardless of the wisdom of the Government's position that a district court may designate more than one case agent when each agent represents a different governmental agency and their trial testimony will not overlap, we are bound by Farnham and Kosko to reject it.

In short, the district court erred in permitting the Government to designate two case agents, both of whom were exempted from the sequestration order and both of whom testified at Neely's trial. The question remains, however, whether this error requires us to reverse some or all of Neely's convictions. See Farnham , 791 F.2d at 335 (holding that a violation of Rule 615 does not require vacatur of convictions if the error was harmless). Although both agents testified during the trial, their testimony concerned entirely different matters: Agent Fayed's testimony concerned Neely's telephone records, while Agent Hines testified regarding Neely's financial records. Cf. Kosko, 870 F.2d at 164 (concluding that because "the testimony of the two agents did not overlap as to any matter on which they had personal knowledge, . . . their mutual presence during trial could not have undermined the integrity of the fact-finding process"); Farnham, 791 F.2d at 334 (finding violation of Rule 615 not harmless when two agents testified regarding their personal knowledge of the same events). We therefore conclude that the error was harmless.

VII.

Finally, Neely contends that his convictions for conspiracy to possess cocaine for personal use (Count Two) and aiding and abetting the distribution of cocaine (Count Three) are mutually exclusive, thereby requiring reversal of Count Three, the more serious crime. Specifically, Neely claims that the affirmative finding of intent required for a conviction on the possession count -- i.e., the intent to possess cocaine -- necessarily precludes an affirmative finding of the intent required for conviction on the aiding and abetting count -- i.e., the intent to distribute cocaine -- because one cannot intend simultaneously to possess something and to distribute it.

23

We are not persuaded by this argument. There was ample evidence from which the jury could conclude that Neely conspired with other individuals to obtain cocaine for his personal use while simultaneously aiding and abetting Kimbler in his distribution activities. At most, the jury's verdicts on these counts are inconsistent, but this does not entitle Neely to an acquittal on Count Three. See United States v. Powell, 469 U.S. 57, 63 (1984); see also United States v. Arrington, 719 F.2d 701, 705 (4th Cir. 1983) (concluding that acquittal on conspiracy charge is not a valid basis for reversal of conviction on charge of aiding and abetting), cert. denied, 465 U.S. 1028 (1984).

VIII.

We have reviewed carefully all of Neely's assignments of error and conclude that none of them warrants reversal of his convictions. Accordingly, Neely's convictions are affirmed.

AFFIRMED

24